### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### WACHTER CONSTRUCTION, INC.; BSI Constructors; Woermann Construction Company; Don C. Musick Construction Company, Respondents.

No. 93–2982.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1994.

Decided May 5, 1994.

David G. Millar, St. Louis, MO, argued, for appellant.

Vincent J. Falvo, Washington, DC, argued, for appellee.

Before BEAM and MORRIS S. ARNOLD, Circuit Judges and WELLFORD *, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

National Labor Relations Board ("the Board") seeks to enforce its order against respondents, Wachter Construction, Inc., BSI Constructors, Woermann Construction Company, and Don C. Musick Construction Company, who were parties to a master collective bargaining agreement between the St. Louis area Associated General Contractors ("AGC") and the Local 513 of the International Union of Operating Engineers ("the union"). The labor agreement covered the three year period beginning May 1, 1989, and included employees of the party companies, including respondents, who work on heavy construction projects in the covered area. Portions of § 1.08 of the agreement form the basis of this dispute:

---

* THE HONORABLE HARRY W. WELLFORD, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

Nothing in this Article shall be construed to limit or restrict, in any way, the Employer's right to determine which portions of the work, if any, the Employer may perform with the Employer's own employees or may subcontract to others.

The Employer shall not undermine the wage and fringe benefit standards established by this agreement by subcontracting work that would be otherwise done by bargaining unit employees at a construction job site for performance except by subcontractors who agree in writing to pay wages and fringe benefits of monetary value in aggregate equal to or greater than those provided in this agreement.

In the event the subcontractor does not pay wages and finger benefits in the aggregate as provided in this Agreement, the Employer shall terminate the subcontract and remove the subcontractor from the job site.

It is understood and agreed that this subcontractor clause requires said subcontractor to abide by and be bound by the terms and provisions of this collective bargaining agreement only for the period and on the project where the subcontractor relationship exists.

The Board's general counsel charged in February and March, 1991, that respondents violated §§ 8(a)(1) and (d)[1] of the National Labor Relations Act ("the Act") by refusing to furnish the union with certain information.

The Board charged that respondents' failure to furnish this information constituted unfair labor practices under the Act. The respondents contested the unfair labor practice charges at a hearing before Administrative Law Judge ("ALJ") Wolfe, who made detailed findings and conclusions on October 17, 1991. The ALJ determined that "by

refusing to furnish the Union with requested information that is relevant to administering the Union's collective bargaining agreement with Respondents, the Respondents have each violated Section 8(a)(5) and (1) of the Act." The ALJ ordered that respondents cease and desist from continued refusals and take affirmative action to furnish the union with the specified information. Respondents denied that they committed unfair labor practices as charged and appealed to the Board, which affirmed the decision by a divided vote. The dissenter would have denied much of the relief afforded by the ALJ and the Board majority. We find the union's predominant purpose in making its request was to harass the employers and force them to cease a practice permitted under the collective bargaining agreement. Accordingly, we **REVERSE** and **DENY** enforcement of the Board's order.

## I. *FACTUAL BACKGROUND*

Respondents are general construction contractors operating in St. Louis, Missouri. They have a multi-employer collective bargaining agreement not only with the operators local, but also with the laborers union. The petitioner does not dispute that the respondents had the right to subcontract work to non-union forces so long as they adhered to contract terms and paid wages and fringe benefits equivalent to union scales. The collective bargaining agreement required the respondents to obtain the non-union subcontractor's written commitment to pay, in the aggregate, the union scale involved according to work classification. Prior to the period in controversy, a number of St. Louis area paving contractors became non-union entities. Paving work was subcontracted to some of

---

1. The pertinent portions of the Act involved are as follows:

(a) It shall be an unfair labor practice for an employer—

  (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   .    .    .    .    .

(d) Obligation to bargain collectively

  For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representa-

tive of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.

29 U.S.C. §§ 158(a)(1) and (d).

these non-union firms by the respondents (and other collective bargaining agreement signatories).[2] This paving work related to both operating engineers and general laborer categories. Thus, the laborers and operating engineers had similar and closely related interests in dealing with paving contractors like the respondents.

According to the ALJ, in the fall of 1990, concerned about the growth in non-union activity, Myrl Taylor, head of the laborers union, "embarked on a course of action designed to force the AGC members to subcontract only to unionized employers." Taylor's "real concern was asphalt paving contracting." Taylor "prepared model [information] request letters, and mailed copies to all 31 unions in the Building Trades Council," including the union in controversy here. The operators union used Taylor's model; all of the other union recipients did not.

The union's business manager, Jack Sawyer, sent the following identical letters to the respondents, as suggested by Taylor, in the latter part of 1990:

RE: Enforcement of Section 1.08 of the Collective Bargaining Agreement between the Associated General Contractors of St. Louis and the International Union of Operating Engineers Local No. 513.

As you know, you are a party to the above collective bargaining agreement.

Section 1.08 of the agreement permits subcontracting of operators work provided certain conditions are met by the subcontractor. In order to ensure compliance and properly enforce Section 1.08, this is to request that you provide me with a copy of all agreements in which you have subcontracted covered on-site construction work to any other contractor within the geographic area covered by the contract since May 1, 1989. You may delete any confidential financial information from the information provided.

Also, please provide a list of each job for which you have provided a subcontract as requested. As to each subcontract: 1) identify the location, 2) state the name of

the subcontractor, the nature of the project and of work subcontracted, and 3) state the date the subcontracted work began and was completed or is to be completed.

Finally, as to each subcontractor during the period covered by this information request, please provide us with copies of the subcontractors' payroll records for the employees performing covered operators work. This request includes all records needed to verify all wages, fringe benefit contributions, or other payments of any kind to employees to ensure compliance with section 1.08. If you so desire, you may make arrangements for us to independently audit such records ourselves rather than obtaining and forwarding the records to us.

Please provide the requested copies of subcontract agreements and payroll records within ten (10) days. If you need additional time, or have any questions about the information requested, please feel free to contact me. Otherwise, I will expect the information within the requested time. Thank you for your cooperation in this matter.

Sawyer sent this same letter again to the respondent Wachter on January 18, 1991, together with a new letter, and also sent these two documents to the other respondents. The second letter again made reference to § 1.08 and requested promptly a copy of each subcontract on a continuing basis (deleting confidential financial information). In addition, Sawyer requested notice "as to each job site on which you are performing work" with "verification that all *laborers work* is either performed by your company or properly subcontracted." (emphasis added). Any failure to provide the requested information was to be deemed a waiver by the respondent of an arbitration provision under § 10.01. Conformance to this request, or demand, was sought within a week "indicting [sic] your agreement to providing the requested documents and informa-

---

**2.** The ALJ found that the respondents "have not historically and do not now perform paving work with [their] own employees."

tion," or "appropriate legal steps" would be taken.

The ALJ found that "there is reason to believe that Taylor's efforts were really directed at harassing employers into giving their paving work to unionized contractors," and that "Sawyer, like Taylor, was concerned about the subcontracting of asphalt paving." The respondents, or most of them, responded to Sawyer's communications indicating that they did not possess information about, or have access to, their subcontractors' payrolls. They took exception to the union's "open-ended request" for continuing future information about "every construction contract ... irrespective of whether any Operating Engineer's work is involved ..., or whether any work is subcontracted."[3] The ALJ found that after exchanges of communications, the respondents gave the union only "some information" but rejected requests for:

(1) information covering a period more than 30 days prior to said requests, (2) subcontractors' payroll records not in the Respondents' possession, (3) the actual subcontracts, and (4) the furnishing of subcontracting information on a continuing basis.

(footnote omitted).

The respondents contended before the Board and argue on this appeal that the union was demanding voluminous, irrelevant, oppressive amounts of materials in bad faith to harass them into contracting only with unionized asphalt paving contractors.[4] The laborers union had earlier demanded this same or similar information from them, and the respondents point to Taylor's stated motivation:

They may be able to cram that s..t down our throats but we sure don's [sic] have to make it easy for them.

Enclosed is some "stuff" we had our attorney put together for us....

We can cause those contractors letting subcontracts to nonunion outfits so much "paper work" answering, and producing the things we're entitled to, pure grief responding to us, and financial obligations so high they won't make much profit screwing our people. If we can make it cost more to sub to scabs than to "fair" contractors then it won't be so attractive for them to do it.

Taylor's letters to the respondents, and others, threatened enforcement of his demands for information by filing NLRB charges against those that failed to comply promptly. To those who would agree "to use AFL–CIO subcontractors ... no further reports, sub-contracts or payroll records are demanded." To those who agreed to cooperate in stopping use of non-union subcontractors or laborers, Taylor stated further that "we hold all charges, demands and litigation in abeyance."[5] The record reflects that the union here decided to follow substantially Taylor's example. The union even referred to *laborer's work* in their letters to the respondents rather than to relevant work of operating engineers.[6]

Sawyer wrote to another AGC signatory to the same effect on January 14, 1991. The ALJ found that "the Union's requests for information are indeed directed at the subcontracting of paving work," exactly the area of interest and the subject of efforts by Taylor of the laborers union. The record reflects no prior grievance filed, nor any complaint made by Sawyer or union *members* about any alleged failures of respondents to fulfill contract obligations in respect to asphalt paving (or other contract) jobs before the first union letter demanding information

**3.** Wachter did furnish the union with subcontract copies and one subcontractor's payroll. The others did furnish some of the subcontract information.

**4.** Respondent BSI's representative testified that it had entered into 853 subcontracts over an approximate two year period since May 1, 1989. Woermann had 602 subcontracts during the same period; another respondent had 1247, another 686.

**5.** It is apparent that Taylor, the initiator of this type of action involving paving contracts or subcontracts, was less concerned about administering and enforcing compliance with union scales than about pressing the respondents to deal only with union subcontractors and laborers.

**6.** The union's business representative admitted that it used the "basic wording" furnished by the laborers union.

was issued. Sawyer stated no basis for seeking the information except that it was "[i]n order to ensure compliance and properly enforce Section 1.08," precisely the language employed by Taylor at his lawyer's direction.

Walter Arnette, the union's business representative, testified that "as a rule" the union had no access to payroll records of "non-signatory subcontractors." Among other things, Arnette also testified that the union was trying to determine if the respondents were "paying a prevailing wage" and if the non-union subcontractors "have underbid our other [union] contractors too much." [7] Arnette stated he had asked "people on the job that are running equipment what they make," and said that on jobs of two of the respondents (Wachter and Musick) workers indicated from $8 to $12 an hour. He suspected that the respondents were not paying union scale, but produced no evidence to this effect. The action, he testified, was based on complaints received from "Bituminous contractors," signatory companies in the same line of work as the respondents.

The union, after an exchange of correspondence with the respondents and after receiving at least partial responses to requests for information, went directly to the NLRB with unfair labor practice charges without further negotiation or discussion. This followed the pattern and practice of the laborers union, and they were the only construction trades unions to do so. The union conceded that this type of demand was a first; such notification to employers and demand for information of this type had not taken place before. The respondents testified that compliance with union demands, after deleting confidential information, would take extensive supervision and accounting time effort. (BSI estimated 250 to 350 hours of such time.) The respondents testified that they were not, in the normal course of operations, ever furnished their subcontractors' payroll records except in special "prevailing wage work" situations. The union did indicate in its letter a willingness to work "to minimize the clerical work required." The respondent Musick,

moreover, testified that "most of the time" it contracted with union paving subcontractors.

The Board majority affirmed the ALJ in its decision, concluding that "the Union has carried its burden of showing that the request for information concerning subcontractors raises 'the probability that the desired information was relevant ... in carrying out its statutory responsibilities.'" It concluded also that the request was neither "overbroad or intended to harass the Respondents" and "[t]he burden and time necessary to fulfill a request for information is not a basis for refusing the request." The Board found that the respondents were guilty of unfair labor practices.

The dissenting member differed "as to the scope of information that is required to be produced," limiting the period of production to the preceding six months before the demand. The dissenter also would not require the respondents to obtain and furnish "independent" subcontractor payroll records. The dissenter felt that "the Union has not shown the reliance and need for the additional information requested," and that its request was meant, at least in part, to harass the respondents.

The Board majority relied principally upon *Island Creek Coal Co.*, 292 NLRB 480 (1989), for its decision. That case, however, involved a UMW effort to obtain documentary information about the legal relationship between Island Creek, as "successor," and Laurel Run Mining Co., who were involved in coal mining activities which the union contended were covered by a master wage contract. The union was concerned whether Laurel Run or Island Creek had violated the terms of the controlling wage agreement for the Bituminous industry. Island Creek took the position that the additional production and merger information sought was not "relevant to your duties and responsibilities." The specific dispute was Island Creeks's alleged "contracting out of the production of coal at Laurel Run," a non-union operator. The ALJ determined that the union sought this information to harass Island Creek. The Board reversed, however, concluding:

---

7. "Prevailing wage" standards apply only to contracts to which the federal government is a party.

What Arnette was referring to is prevailing "union" wage, which is quite different.

[T]he Union sought to obtain documents that it hoped would shed light on the actual identity of the employees' employer following the purchase and of sale of Laurel Run, and the extent to which the Respondents had complied with their contractual duties to secure the "successor's" agreement to comply with the terms of the contract. It can hardly be contended that a union is not entitled to know the identity of the employer of the employees it represents, and certainly the Union was entitled to know who the "successor" was and whether it had complied with any obligations arising from the contract. Similarly, having been informed that Island Creek was managing Laurel Run, the Union had an interest in knowing the terms of the management relationship, so that it could determine, among other things, whether Island Creek was a joint employer with Laurel Run.

*Island Creek,* op. p. 14. The Board added, however:

[W]e find that the Respondents were not given notice of the relevance of the information sought until May. None of the requests were, on the surface, concerned with terms and conditions of employees in the unit. A showing of relevance therefore was required.

*Id.*

There was an appeal of *Island Creek,* and the appellate court set forth the nature of controversy succinctly:

The NLRB found that both the merger agreements and the production forecasts were relevant to the union's representation of its members, but held that union had failed to demonstrate to the companies the relevance of anything other than the production documents. The Board found, therefore, that the companies had committed unfair labor practices only as to the production documents. Both the companies and the union petitioned for review, and the Board petitioned for enforcement of its order. We shall grant the petition for enforcement.

*Island Creek Coal Co. v. NLRB,* 899 F.2d 1222 (6th Cir.1990) (unpublished opinion).

The appellate court affirmed the Board, but noted as to part of the information sought:

[H]ere the union merely asserted that the information was necessary to represent the employees intelligently. Such boilerplate is insufficient to establish relevance. *Soule Glass & Glazing Co. v. NLRB,* 652 F.2d 1055, 1099 (1st Cir.1981).

*Id. Island Creek* also discussed the union's failure to explain the relevance of some of the material it was seeking, noting that the union did not "tell the companies that the result of the discussions was unsatisfactory."

We note that *Island Creek* was concerned with much more specific and limited information than is sought in this case. Most of the information sought was under respondent's control or that of a subsidiary or affiliate entity. There was no specific evidence noted that the union was seeking to harass the respondent or that UMW was not acting in good faith. The evidence and information sought was not in the possession and control of independent subcontractors as in the instant case.

■ We turn now to the controlling principles of our review of the Board's order. The employer has an obligation to supply, upon reasonable request, to the bargaining representative of its employees relevant information to assist the union's effective performance of its duties under a collective bargaining agreement. *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–436, 87 S.Ct. 565, 567–568, 17 L.Ed.2d 495 (1967). Failure to fulfill that obligation to furnish relevant materials upon request is a violation of the employer's duty to bargain in good faith and may violate § 8(a)(5) of the Act. Such conduct "conflicts with the statutory policy to facilitate effective collective bargaining." *Procter & Gamble Co. v. NLRB,* 603 F.2d 1310, 1315 (8th Cir.1979). Information sought that does not directly relate to bargaining unit employees is deemed not to be presumptively relevant. *NLRB v. Postal Service,* 888 F.2d 1568, 1570 (11th Cir.1989); *Walter N. Yorder & Sons v. NLRB,* 754 F.2d 531, 535 (4th Cir.1985); *Oil Chemical & Atomic Workers v. NLRB,* 711 F.2d 348, 359

(D.C.Cir.1983). The ordinary standard of what is relevant is a "liberal" one of the type sought in discovery. *Acme,* 385 U.S. at 437, 87 S.Ct. at 568.

The Board in this case found that the information sought did not have a presumption of relevance, and thus correctly imposed upon the union a duty to show that it was relevant. The union's request merely referred to ensuring compliance with and enforcing § 1.08, a "boilerplate" type of basis or support for voluminous information going back over a substantial period of time. *See Island Creek.* Here, as in *Island Creek,* the union gave no detailed explanation nor reasonable notice of the purpose of an unprecedented request for information and, furthermore, it was not even respondents in possession or control. Also, as in *Island Creek,* the union failed to indicate before filing charges why the respondents' responses and furnishing of at least some of the requested information was "insufficient."

■ We must also consider the issue of what constitutes bad faith in the context of a request for information from one party to a collective bargaining agreement to another party. This court has recognized that "[t]he question of good faith bargaining is for the Board's expertise more than ours." *Kellwood Co. v. NLRB,* 434 F.2d 1069, 1074 (8th Cir.1970), *cert. denied,* 401 U.S. 1009, 91 S.Ct. 1257, 28 L.Ed.2d 544 (1971). However, the Board's discretion is not limitless and the Board must apply the proper legal standard in making its good faith determination. Reviewing the Board's decision, it appears it improperly stated the standard of "good faith" to which the parties must adhere when bargaining.

The Act provides that: "It shall be an unfair labor practice for a labor organization or its agents—(3) to refuse to bargain collectively with an employer." 29 U.S.C. § 158(b)(3). The Act further provides that: For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and *confer in good faith* with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder.

29 U.S.C. § 158(d) (emphasis added). The Supreme Court stated that: "Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, [and the] resolution of new problems covered by existing agreements." *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The courts have uniformly recognized that requests for information to enforce an existing bargaining agreement clearly fit under the definition of "collective bargaining." *See, e.g., NLRB v. Truitt Manufacturing Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956) (in determining whether good faith bargaining obligation has been met, Board may consider employer's refusal to give information about its financial status); *Local 13, Detroit Newspaper Printing and Graphic Communications Union v. NLRB,* 598 F.2d 267 (D.C.Cir.1979) (just as employers have good faith duty to supply information to union, union is also bound by good faith obligation in its dealings with the employers).

According to *Truitt Manufacturing,* 351 U.S. at 153–154, 76 S.Ct. at 756, a case which determined whether an employer had acted in good faith when it denied to meet a union's request for information, "Each case must turn upon its particular facts. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." The Act mandates that both parties "confer in good faith." This obligation to "confer in good faith" applies to both employers and unions. "The union is likewise obliged to furnish the employer with relevant information." *Local 13, Detroit Newspaper Printing and Graphic Communications Union v. NLRB,* 598 F.2d 267, 271 (D.C.Cir.1979). Because it is quite evident from the case law that there are reciprocal duties of good faith between both parties to a collective bargaining agreement and the Supreme Court has enunciated an "all the facts and circumstances test" for determining what constitutes good faith, this court is not satisfied in this case that the Board is using a

proper standard to determine whether the union in the instant case made a good faith request for information.

In its decision and order, the Board states that "although an employer need not comply with an information request where the sole purpose for the request is to harass the employer, the good-faith requirement will be satisfied where *any* of the union's reasons for seeking the information can be justified. *Island Creek Coal,* 292 NLRB 480 (1989)" *Wachter Construction, Inc.,* 311 NLRB No. 26 (1993) (emphasis added). The Board seems to apply this test solely when a union is attempting to obtain information from an employer to administer a collective bargaining agreement. *See also Prentice–Hall, Inc. v. Aerospace and Agricultural Implement Workers of America,* 292 NLRB No. 79 (1988). We find no support in the language of the Act for such a construction of the good faith standard. In *Chevron v. Natural Resources Defense,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984), the Court stated:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions, First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the

court is whether the agency's answer is based on a permissible construction of the statute.

Congress has indicated only that the parties must act in good faith. Therefore, we must determine whether the NLRB's interpretation of what constitutes "good faith" on the part of the requesting party is permissible under the circumstances of this case. The NLRB has created a good faith distinction which finds no support in the Act. Allowing a party, whether it be an employer or a union, to predicate a voluminous request for information on any "boilerplate" type of asserted good faith rationale will wreak havoc on a negotiating process. This is evident from the facts of the instant case, where the union representative sought to overburden the employer with information requests so as to prevent the employer from subcontracting any work to nonunion workers, even though concededly the collective bargaining agreement provided such subcontracting was permissible. A major purpose of the labor laws is to promote peaceful resolution of labor disputes, and it furthers that purpose to permit unions to have access to information needed to investigate alleged violations, after conferring and negotiating with the employer, prior to initiating full-scale grievance proceedings. *See NLRB v. Acme Industrial Co.,* 385 U.S. 432, 437–439, 87 S.Ct. 565, 568–569, 17 L.Ed.2d 495 (1967). Congress has mandated that all parties to a potential or existing agreement "confer in good faith" in § 8(d) of the Act. Since the Act holds all parties to the same standard, we find there is no compelling reason to follow the Board's approach to this case and to ignore the predominant purpose of the union when it is forcing an end not permitted in the collective bargaining agreement.[8]

**8.** In enunciating this test, we again reiterate that the proper focus is, under all the surrounding facts and circumstances, whether the predominant purpose of the party making the request was one of bad faith. We realize the difficulties that this court, the Supreme Court, and our sister circuits have had in formulating the proper framework for determining a party's true intent in mixed-motive situations. Attempts at "but for" causation and other similar tests often lead to semantic hair splitting. As the Supreme Court stated in *Price Waterhouse v. Hopkins,* 490 U.S.

228, 241, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989), "We need not leave our common sense at the doorstep when we interpret a statute." Since the Act simply requires all parties to a collective bargaining agreement to confer in good faith, we feel that an analysis of a party's predominant motivation in making its information request is a logical test to apply. In doing so, we feel this achieves a proper balance between one party's need for information and another party's need to be free from unwanted harassment.

■ There was clear evidence of bad faith conduct of the laborers union which was similar to that of the operators union, although the ALJ and the Board did not attribute bad faith to the operators union. Rather, the Board merely found that "to demand a substantial effort by the employer" and to impose the "burden in time and money necessary to fulfill a request" upon respondents was not harassment, nor "a basis for refusing the request." We believe the Board was in error, without further explanation, in concluding that the union made these information requests in good faith in light of unquestioned background facts in this record.

The laborers union's chief expressed his purpose in initiating precisely the same action undertaken by this union at almost the same time—"to *force* employers" to do business in the paving work area only with labor unions and union subcontractors. It is conceded that this is not a legitimate purpose under the wage agreement. The ALJ noted that the "real concern" and efforts of Taylor and the union in controversy was preventing respondents from subcontracting with non-union people in "asphalt paving contracting." Essentially the same means and methods were used during a close time frame by both unions. The Board made no mention of this compelling circumstance, nor of Sawyer's letter to an employer's attorney in the comparable situation to respondents (Karte Construction) to the effect that: (1) he was being called by other union contractors thanking him for picketing nonunion subcontractors;[9] (2) this particular contractor had let subcontracts to union contractors in only three of seven specified paving jobs (a "poor record"); and (3) "the *operators* and *laborers* are not going to sit idly by and let contractors who have contracts with us, give *our work* to these scabs." (emphasis added).

We fail to understand how the Board majority could have all but ignored the strong and uncontroverted evidence of virtual joint activity by the laborers union and this union directed to the same contractors in the same asphalt paving area. Both unions had members employed in many other areas of general construction operations, but both concentrated their efforts to bringing about union contracting and elimination of non-union subcontracting by respondents and those in comparable situations in asphalt paving. Both refused to negotiate after initial exchange of correspondence or discuss with respondents these sudden demands and, instead, they brought charges before the Board despite the lack of any previous grievance in this area. Taylor admitted that he took the lead, which the operators union followed.

Both Sawyer and Taylor consider all asphalt paving work of respondents under the contract to be "our work." Both considered and referred to non-union contractors as "scabs," as if respondents were required by agreement to deal only with union subcontractors. Both were interested in making it cost more for respondents "to sub to scabs." Taylor said it clearly in his communication to other AGC signatory trades unions: "I don't want our people working along side those scabs under any conditions." Taylor clearly intended to "cause [respondents] ... so much 'paper work' answering, and producing the things we're entitled to, pure grief responding to us...." Significantly, Sawyer did not testify at the NLRB hearing, although the record indicates, without question, he followed Taylor's lead throughout, and he was Arnette's superior. There appears in this record no evidence that the union attempted to explain to respondents the relevance of all the information and documentation sought particularly over an extended period and in situations where payroll records were under third party control.

This court has stated that while it does give deference to the agency decision adopting an ALJ's findings, a "departure ... is vulnerable if it fails to reflect attentive consideration to the ALJ's decision." *Citizens State Bank v. FDIC*, 718 F.2d 1440, 1444 (8th Cir.1983) (quoted in *NLRB v. Hawkins Construction Co.*, 857 F.2d 1224, 1226 (8th Cir. 1988)). Here, the Board has failed to take into adequate account the ALJ's decision as to Taylor's bad faith motivation in seeking harassing information and Sawyer's similar conduct.

9. Both these unions were picketing "these con-    tractors who pay substandard wages."

In a footnote, the Board made only this brief statement about "the other union previously involved in this case,"—the laborer union:

> We also note that the judge did not make a finding that the other union previously involved in this case intended to harass the Respondents in making a similar information request. Although the judge stated that there was "reason to believe" that the other union's efforts were directed at harassing employers, he found that the conduct of that union was not before him and declined to draw any conclusions regarding its motives. He did find, however, that the motives of the other union should not be imputed to the Union here, and credited testimony that the Union was attempting to enforce the subcontracting provisions of its agreement with the Respondents.

The Board made no reference to the ALJ's finding that the "other union's" chief official's activity was *"designed to force* the A.G.C. members to subcontract only to unionized employers," (emphasis added), and that his "real concern" was the same as the operators union to concentrate on "asphalt paving subcontracting." There was clear evidence, pointed out hereinabove and noted by the ALJ, "to believe Taylor's efforts were really directed at harassing employers."

We are puzzled that the ALJ gives no reason for not imputing the same labors union's motives to the head of the employers union who did not even testify at the hearing. If the ALJ found that Taylor's activity basically was to force the respondents (and other AGC contractors) to deal only with union members, despite Taylor's testimony that he was merely operating under a section 1.08 rationale, then why not attribute the same motive to Sawyer, who did not testify? There was good reason for him not to believe Taylor's self-serving testimony at the hearing, contrary to his previous actions, that his *only* purpose was "enforcing contract compliance." We do not think the Board majority is accurate, from the record in this case, in stating that the ALJ made no finding that the laborers union did not intend to harass the respondents "in making a similar infor-

mation request." The Board noted that the ALJ found that "the conduct of that union was not before him."

In view of the similar conduct of the two unions, undeniably led and induced by the laborers union on this record, we conclude that the ALJ and the Board were in error in not concluding that the conduct of *both unions* was indeed "before them" for the purpose of determining whether these almost identical broad and expansive requests for information were for the purpose of harassing and imposing "pure grief" upon the respondents in order to induce subcontracting only with unionized persons. "Bad faith is an issue that of necessity has a strong base in credibility." *NLRB v. Hawkins Const.,* 857 F.2d 1224, 1227 (8th Cir.1988). The responsible person who wrote the letters and set out his position about "scabs" did not testify and accordingly did not deny or explain what he meant in following Taylor's lead. The union was clearly attempting, without a basis in their contract with the respondents and without a basis in provisions of the Act, to coerce the respondents into doing business only with union subcontractors or union employees. The union's claim of proceeding under section 1.08 of the contract could be construed to be little more than a guise to enforce an improper and unlawful demand for the respondents to cease doing business with non-union entities and employees rather than a legitimate basis for seeking relevant information.

■ We would remind the Board that, even had we not found a predominantly ill motive on the part of the union, the employers would not necessarily be responsible for all of the requested information. "Even when the information is objectively relevant, however, a union's request may be denied if its compilation would be unduly burdensome." *Safeway Stores, Inc. v. NLRB,* 691 F.2d 953, 956 (10th Cir.1982). This is a different standard from that stated by the Board that "the burden in time and money necessary to fulfill a request for information is not a basis for refusing the request." We agree with *Shell Oil Co. v. NLRB,* 457 F.2d 615, 618 (9th Cir.1972), that the Board is in error if it is asserting that "once information

is relevant to the Union's performance of its role as bargaining representative, this fixes the duty of the Company to produce and any failure to produce is *per se* an unlawful refusal to bargain." Rather, each case must turn on its particular facts.

The respondents did not commit an unfair labor practice in failing to provide the bulk of the information requested, because the union made its requests in bad faith. The union's bad faith motive in requesting the information alleviated the employers' duty to respond. Accordingly, we **REVERSE** this case and deny enforcement of the Board's order.