BROWN SHOE COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

BROWN SHOE CO., Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Petitioner.

Nos. 93–3642, 93–3847.

United States Court of Appeals,
Eighth Circuit.

Submitted April 14, 1994.

Decided Sept. 2, 1994.

James N. Foster, St. Louis, MO, argued (Terry L. Potter and Ralph E. Kennedy, on the brief), for appellant.

Joseph J. Jablonski, Washington, DC, argued (Howard E. Perlstein, on the brief), for appellee.

Before WOLLMAN, MAGILL, and BEAM, Circuit Judges.

MAGILL, Circuit Judge.

Brown Shoe Company (Brown) petitions for review of a decision of the National Labor Relations Board (Board) finding that Brown violated subsections 8(a)(1) and (a)(5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (5) (1988). The Board cross-appeals for enforcement of its order. We reverse and deny the Board's request for enforcement.

# I. BACKGROUND

The Amalgamated Clothing and Textile Workers (the Union) has represented the employees of Brown's Caruthersville, Missouri, plant since at least 1964. In 1991, new machines were introduced into the Caruthersville plant's bottoming department[1] and lasting department.[2] The employees in these departments are paid according to a piece rate, as opposed to a flat salary or hourly wage. After the introduction of the new machines, employees in the rough and cement section of the bottoming department and the sidelast section of the lasting department complained to their Union representative that they were unable to maintain their average production, and hence were receiving decreased wages. The payroll records made available to the Union representative by Brown indicated that these employees were earning less than they were before the introduction of the new machines and methods.

As a result, the Union representative filed two grievances with Brown: a grievance for the rough and cement employees (Rough and Cement Grievance) and a grievance for the sidelast employees (Sidelast Grievance). Both grievances were denied by Brown. The denials stated that "[i]nvestigation reveals that the piece rate in question is correctly applied from the standard and established piece rate list." J.A. at 456. On November 18, 1991, the Union requested that both grievances be arbitrated.

On December 2, 1991, the Union and Brown began a series of correspondence that ultimately culminated in this litigation.[3] On

---

1. This is the department where the bottoms of the shoes are made and the soles and heels are attached.

2. This is the department where the shoe uppers are formed onto shoe lasts.

3. On December 2, 1991, the Union wrote:

> In order to prepare for arbitration for grievances 32073, 29600, and 32064, the union is requesting dates for the union time study engineer to study the operations involved.
> The dates the union time study engineer will be available are as follows: January 8, 9, 10, 16, 17, 21, 22 and 24, 1991. Please contact me so we may schedule a date.

J.A. at 345.

On December 9, 1991, Brown responded:

> I have received your request for a time study and in light of our pattern of handling previous grievances I am surprised, as was the case when you requested performance of time studies at Piedmont. I am concerned that operations could be seriously disrupted by your time study. Again, as in that case, you offer no assurances that such a study would have sufficient repetition or duration to have any validity. Before I can further evaluate your request for a time study, I would need your specific proposal in this regard.
> In addition to my concerns above, I have investigated the grievances at the Caruthersville facility and can find none which are pending which involve a time study. I would appreciate it if you would further explain the purpose and nature of your request. I look forward to your prompt response in this regard.

Id. at 346.

On December 20, 1991, the Union acknowledged the previous correspondence and stated:

> I have received your letter dated December 9, 1991.
> An arbitrator has been requested for the listed grievances that involve a challenge to the adequacy of the piece rate the company is now applying. The grievances concerning piece rates are the same as listed in the letter of December 2, 1991: #32073, #29600, #32064.
> The Collective Bargaining Agreement, Article XIII, in addition to labor laws, grant the privilege of a union representative[']s presence during a time study. It also permits the review of such study.
> We are requesting the same schedule of dates outlined in the letter of December 2, 1991.
> Please find enclosed copies of the companys [sic] appeals minutes referring to the listed grievances as involving piece rate challenges.

Id. at 347.

Finally, Brown responded on December 27, 1991:

> I received your letter dated December 20, 1991, but I am still puzzled by your request. Yes, we agree that Article XIII, Section 5 of the present contract does state as follows:
> "In the event that a time test is made *by the Company* as a result of a grievance submitted by the Union, it is understood and agreed that a representative of the Union shall be permitted to be present during the making of such test and shall be permitted to view the results of the test. The Company in the foregoing cases shall furnish to the *President of the Local Union* a signed copy of the time study summary sheet and shall, if requested, permit the Union representative to see the complete data sheets pertaining to the time study."
> As I stated in my letter dated December 9th our investigation shows that none of these

January 29, 1992, without further communication, the Union filed charges against Brown with the Board, alleging that Brown had unlawfully denied the Union's request to conduct a time study.[4] On February 25, 1992, the Board issued a complaint against Brown alleging that the December 9 and 27 letters unlawfully refused to permit the Union to conduct a time study.

On April 13, 1992, an administrative hearing was held. The administrative law judge (ALJ) found that Brown performed some type of unilateral time study or investigation, Brown had failed to offer any evidence that the Union had alternate means of obtaining the necessary information short of a time study, and the Union had no other means of arbitrating the grievance without the time study. The ALJ found that Brown had violated § 8(a)(1) and (5) of the Act based on the balancing test described in *Holyoke Water Power Co.*, 273 N.L.R.B. 1369, 1985 WL 45963, *enforced sub nom. NLRB v. Holyoke Water Co.*, 778 F.2d 49 (1st Cir.1985), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3274, 91 L.Ed.2d 565 (1986).

The Board reviewed the ALJ's decision, concluding that the ALJ's finding that Brown had performed unilateral time studies was unwarranted speculation. It nevertheless proceeded to affirm the decision. Agreeing with the ALJ that Brown denied the Union access to perform the time studies, the Board found that there were no alternate means for the Union to obtain the relevant data, and

thus, Brown had violated the Act. The parties timely petitioned this court for review.

## II. DISCUSSION

The Board charged Brown with violating the Act "by denying and continuing to deny the Union the opportunity to have its time study engineer review and study certain operations related to pending grievances at its Caruthersville, Missouri facility." J.A. at 1. The ALJ found that Brown's denial of Union access to the plant was a failure to bargain with the Union in good faith in violation of § 8(a)(1) and (a)(5) of the Act.[5] Brown argues that substantial evidence on the record as a whole does not support the Board's findings that (1) Brown's December 9 and 27, 1991 letters denied the Union access to conduct its time study; (2) Brown was required by the Act to allow a non-employee Union representative on its property to conduct a time study; and (3) a time study was the only means by which the Union could responsibly represent the employees. Brown further argues that the enforcement of the Board's order should be denied because the ALJ's conduct and rulings deprived it of a fair trial. In response, the Board contends that substantial evidence supports its finding that the Union was denied access, the information sought was relevant and necessary to represent the plant employees, and the employees' right to responsible representation justified the limited infringement of Brown's

---

cases pending involve making a time study by the Company; but if the Company did, as always we would notify the Local Union representative and they would be free to observe and have the information as stated in Article XIII, Section 5.
The following dates are dates I presently have available for arbitration. . . .
*Id.* at 348.

**4.** On February 11, 1992, the Union wrote Brown again.

In order to be sure we have a complete understanding of the union['s] request concerning the time study issues at the Caruthersville, Missouri facility, we are listing the following options that are agreeable:
1. The company['s] time study engineer may perform the time studies with the union['s] time study engineer observing the study as it is being conducted in its entirety.

2. The union time study engineer will conduct his own time studies either with or without the assistance of the company time study engineer.
J.A. at 349. After receiving this letter, Brown attempted to resolve the grievances and was successful in resolving the Rough and Cement Grievance without a time study.

**5.** Those subsections read:
(a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
29 U.S.C. § 158(a)(1), (5).

property rights. Finally, the Board contends that Brown was not deprived of a fair trial.

■■■ "We will enforce an order of the National Labor Relations Board if the Board has correctly applied the law and if substantial evidence in the record supports its findings." *NLRB v. Earle Indus., Inc.*, 999 F.2d 1268, 1272 (8th Cir.1993). An employer's duty to bargain in good faith encompasses an obligation to provide relevant information to union representatives in order that those representatives may bargain effectively on behalf of their members. *NLRB v. Wachter Constr., Inc.*, 23 F.3d 1378, 1384 (8th Cir. 1994). Typically, the standard of relevancy is a liberal one, similar to that used for discovery purposes. *Id.* at 1385. However, when a request for access to information impinges upon an employer's property rights, closer scrutiny may be justified. The Board devised a test that "balance[s] the employer's property rights against the employees' right to proper representation," *Holyoke*, 273 N.L.R.B. at 1370, 1985 WL 45963. Although our circuit has not yet examined the *Holyoke* test, both parties agree that its analysis applies to this case. *See* Appellant's Br. at 13; Appellee's Br. at 10.[6]

■■■ In *Holyoke*, a company denied access to a union industrial hygienist for the purpose of surveying potential health and safety hazards. 273 N.L.R.B. at 1369, 1985 WL 45963. Relying on *Winona Industries*, 257 N.L.R.B. 695, 1981 WL 20668 (1981), the *Holyoke* ALJ treated the request for access as a request for information and concluded that access could not be denied. *Holyoke*, 273 N.L.R.B. at 1369, 1985 WL 45963. Relying on *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), the *Holyoke* board disagreed with the ALJ and agreed with the employer that such rights to information were not absolute and must be weighed against the employer's competing property rights. *Holyoke*, 273

N.L.R.B. at 1370, 1985 WL 45963. In *Holyoke*, the board stated:

> [E]ach of two conflicting rights must be accommodated. *Fafnir Bearing Co. v. NLRB*, 362 F.2d 716 (2d Cir.1966). First, there is the right of employees to be responsibly represented by the labor organization of their choice and, second, there is the right of the employer to control its property and ensure that its operations are not interfered with. As noted by the Supreme Court in *Babcock & Wilcox*, supra, 351 U.S. at 112 [76 S.Ct. at 684], the Government protects employee rights as well as property rights, and '[a]ccommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other.'

> Thus, we are constrained to balance the employer's property rights against the employees' right to proper representation. Where it is found that responsible representation of employees can be achieved only by the union's having access to the employer's premises, the employer's property rights must yield to the extent necessary to achieve this end. However, the access ordered must be limited to reasonable periods so that the union can fulfill its representation duties without unwarranted interruption of the employer's operations. On the other hand, where it is found that a union can effectively represent employees through some alternative means other than by entering on the employer's premises, the employer's property rights will predominate, and the union may properly be denied access.

*Id.*

We are satisfied that the Board's application of the *Holyoke* balancing test to the Union's request for access to perform a time study is consistent with the provisions of the Act. *See NLRB v. National Broadcasting Co., Inc.*, 798 F.2d 75, 77 (2d Cir.1986).[7] Thus,

---

6. Because the parties have not briefed the issue, we assume that the *Holyoke* balancing test is the proper test. We note that the parties' adoption of the *Holyoke* test affects our application of Eighth Circuit precedent. *See McGraw–Edison Co. v. NLRB*, 419 F.2d 67 (8th Cir.1969); *Hamburg Shirt Corp. v. NLRB*, 419 F.2d 1275 (8th

Cir.1969); *cf. Detroit Edison Co. v. NLRB*, 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979).

7. Our sister circuits faced with information access questions since *Holyoke* have either refused to choose between the *Winona* standard and the *Holyoke* balancing test because both would yield the same result under the facts of the particular

our focus is on whether substantial evidence on the record supports the Board's result when it applied the *Holyoke* balancing test to the facts of this case. We hold that substantial evidence on the record as a whole does not support the Board's conclusion that Brown violated the Act.[8]

Although substantial evidence on the record supports the Board's conclusion that the time study data was relevant to representation of the employees, our examination of the record does not support the Board's necessary conclusion under *Holyoke* that the Union could not responsibly represent the employees without access to perform the time studies.[9] *See Holyoke*, 273 N.L.R.B. at 1370. The Board found that "the Union had no alternative means for gathering the timestudy information." *Brown Shoe Co. & Amalgamated Clothing & Textile Workers*, 312 N.L.R.B. No. 65, 1993 WL 373934 (Sept. 21, 1993). Further, the Board found that the joint investigation contractually agreed upon by the parties in the collective bargaining agreement (CBA) was "no substitute for an actual timestudy of the machine in question,"

*id.*,[10] and that Article XIII, Section 5 of the CBA[11] provides for time studies.[12] *Id.*

The Board improperly required that the Union have "alternate means for gathering the timestudy information." *Id.*[13] "[W]here it is found that a union can effectively represent employees through some alternate means other than by entering on the employer's premises, the employer's property rights will predominate, and the union may properly be denied access." *Holyoke*, 273 N.L.R.B. at 1370. *Holyoke* does not require that a union have alternate means of performing a time study or collecting time study data, but rather that a union have alternate means of effectively representing the employees on the particular bargaining issue.

The Board erred when it found that Brown violated the Act because substantial evidence does not support a finding that the Union could not responsibly represent the employees' piece-rate grievances without access to the plant for purposes of performing a time study. The record indicates that the Union has resolved sixty-eight piece-rate grievances in the last three years without time studies.[14]

---

case or have applied *Holyoke*. *See NLRB v. American Nat'l Can Co., Foster–Forbes Glass Div.*, 924 F.2d 518, 524–25 (4th Cir.1991) (applying *Holyoke* to a request for access to obtain heat data); *Hercules, Inc. v. NLRB*, 833 F.2d 426, 429 (2d Cir.1987) (applying *Holyoke* to a union's request for information because it implicated the company's heightened property interest in its secret manufacturing processes); *ASARCO, Inc., Tennessee Mines Div. v. NLRB*, 805 F.2d 194, 197–98 (6th Cir.1986) (refusing to decide the applicable test because both tests would yield the same result under the facts of the case); *NLRB v. National Broadcasting Co., Inc.*, 798 F.2d 75, 77 (2d Cir.1986) (applying *Holyoke* to a union's request for access to a remote facility in order to ensure compliance with the contract agreement).

**8.** Having reviewed the record, we hold that Brown's claim that it was deprived of a fair trial lacks merit.

**9.** In light of our holding, we need not decide whether Brown's correspondence with the Union denied the Union access to perform a time study.

**10.** Article III, Section 6 of the CBA states in relevant part that

[w]here a new job, a new machine, or a new method is introduced into the factory and, after a reasonable learning period, the operators thereon fail to reach their former line average, the Company and Union shall make a

joint investigation to determine the cause of such failure.
J.A. at 284.

**11.** Article XIII, Section 5 reads:

In the event that a time test is made by the Company as a result of a grievance properly submitted by the Union, it is understood and agreed that a representative of the Union shall be permitted to be present during the making of such test and shall be permitted to view the results of the test. The Company in the foregoing cases shall furnish to the President of the Local Union a copy of the time study summary sheet and shall, if requested, permit the Union representative to see the complete data sheets pertaining to the time study.
J.A. at 325.

**12.** Article XIII, Section 5 cannot be read to accord the Union a right of access to perform a time study.

**13.** The Board repeated this error throughout its analysis, finding, for example, that the joint investigation was not a substitute for a time study and that "union access was necessary for a timestudy to be accomplished." *Id.*

**14.** The record does not reveal the nature of these resolved grievances. Although not dispositive in

J.A. at 611. The president of the Union local testified that over the last six years piece-rate grievances have been resolved either with arbitration or with wage increases. *Id.* at 112. The record indicates that Brown provided the Union with access to information regarding the exact earnings of the employees, as well as the number of items they produced and the wage rate attributable to that production. *Id.* at 180. Brown also suggested at the hearing that the Union could have sought production rate data from the machine manufacturer. *Id.* at 183–84. Furthermore, the affidavit of a Union representative, which was offered into evidence, suggested that time studies performed in other Brown plants might be available for the relevant machines.[15] *Id.* at 384.

Despite the fact that the parties had agreed in their CBA that a joint investigation should be undertaken when wages decrease in a situation such as this, the Union representative testified that the contractual joint investigation was never requested.[16] *Id.* at 209. In a conclusory fashion, the Union representative merely testified that the only method for determining a piece rate was a time study. *Id.* at 182. This evidence examined as a whole is wholly inadequate to conclude that without access to perform a time study, the Union could not responsibly represent the employees.[17]

We are disturbed by the Union's refusal to offer Brown assurances that the presence of the Union time study engineer would not disturb or disrupt its operations. *See id.* at 173, 174, 176, 180, 200, 201; *see also supra* note 3. Had the Union attempted to allay Brown's fears of disruption on its property, such assurances would have factored favorably into the *Holyoke* balancing test. *See ASARCO, Inc., Tennessee Mines Div.,* 805 F.2d at 198. Assuming, without deciding,

that Brown denied the Union access to perform the time studies, the Board properly should have weighed the effect such studies would have upon Brown's operations against the availability of alternate means of effectively representing the employees. Because substantial evidence on this record does not support the Board's conclusions, we reverse.

### III.  CONCLUSION

We reverse the Board's decision finding that Brown violated § 8(a)(1) and (a)(5) of the Act and we deny enforcement of the Board's order.

---

isolation, the resolution of the grievances is relevant evidence that there may exist other means of responsibly representing the employees.

**15.** The affidavit read in relevant part:
It is possible that the ER [employer] has performed time studies on these machines at other facilities and that is how they determined the piece rate. But even if that is true, I would still want a time study done at the Caruthersville facility.
J.A. at 384.

**16.** *See supra* note 10.

**17.** Although we do not rely upon this fact, we note that the evidence on alternate means of representation may have been inadvertently limited by the ALJ. The ALJ at the time of the hearing believed that evidence on alternate means was not part of the analysis in a case such as this. *See* J.A. at 187.