# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3652/3948

_____

| | | |
|---|---|---|
| Supervalu, Inc.-Pittsburgh Division d/b/a Uniontown County Market, | * * * * | |
| Petitioner/Cross-Respondent, | * * | On Petition for Review and |
| v. | * * * | Cross-Application for Enforcement of an Order of The National Labor Relations Board |
| National Labor Relations Board, | * * | |
| Respondent/Cross-Petitioner. | * | |

_____

Submitted: April 23, 1999
Filed: July 19, 1999

_____

Before BEAM, HANSEN, Circuit Judges, and MOODY,[1] District Judge.
_____

MOODY, District Judge.


Petitioner Supervalu, Inc.-Pittsburgh Division d/b/a Uniontown County Market (the Company), seeks a reversal of a September 23, 1998 Decision and Order of the National Labor Relations Board ("the Board") finding that the Company violated

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 151, et seq., ("the Act") by refusing to furnish the United Food and Commercial Workers International Union, Local Union 23, AFL-CIO, CLC, ("the Union") with a copy of the sales agreement entered into between the Company and the purchaser of one of its grocery stores. The Board made cross-application to enforce its Decision and Order against the Company. Because the Union's request for the sales agreement was for relevant information and made in good faith, the Company's petition for review will be denied and the cross-application of the Board to enforce its order will be granted.

The Company is in the retail food business. Between about May 1995 and October 1996, the Company owned and operated a grocery store in Uniontown, Pennsylvania, under the name Uniontown County Market ("the Store"). Prior to that time, the Store was owned by Cherry Tree Food Mart, Inc. ("Cherry Tree"). Cherry Tree and the Union had entered into a collective-bargaining agreement effective by its terms from November 1993 to February 1997 ("the Agreement"). The Agreement obligated Cherry Tree, upon sale of the Store, to make a "good faith" effort to persuade the purchaser of the Store to abide by the terms of the Agreement. When the Company assumed possession of the store in the spring of 1995, it recognized the Union as the employees' representative, and the Company and the Union agreed to be bound by the Agreement.

On October 6, 1996, the Company announced to the employees that it was selling the Store. It told the employees that the purchaser was Nikae Foods, owned by Tom Jamieson. The Company also informed the employees that they would be offered employment by the new owner, and that it would not be necessary for them to apply for such employment. The Union business representative, upon hearing the announcement, reported the details to the Union's director of collective bargaining.

By letter dated October 14, 1996, the Company officially notified the Union that it was closing the Store, effective October 19. It invited the Union to contact it for the

purpose of engaging in bargaining over the effects of the closing. As announced, the Company closed the Store on October 19. On October 27, the new owner reopened the Store under the name Uniontown Shop 'n Save ("Shop 'n Save"). The new owner hired all new employees, not any of which were the previous employees, and refused to recognize the Union.

On October 30, the Union requested negotiations to discuss the decision to close the Store and the effects of such closing on the Union's bargaining unit. The Union, in an effort to prepare for negotiations, specifically asked for copies of any sales agreements relating to the sale of the Store; information regarding how the employees were notified of the closing; and information regarding any efforts made by the Company to comply with the Federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq, ("WARN").

The Company responded by letter to the Union's request for information. The Company asserted it had no obligation to bargain over its decision to close the Store. With respect to the request for information relevant to bargaining over the effects of the closing, the letter stated as follows:

> "You are well aware that verbal notice of the sale was given to the Union and the employees two weeks before the sale took effect. You are also well aware that the store's assets were purchase by NIKAE FOODS, INC. In line with Article 1.2 of the labor agreement, an attempt was made by SUPERVALU prior to the sale to have NIKAE FOODS abide by the labor agreement. An updated seniority list as of October 19, 1996, is also enclosed, as you requested."

Appendix at 187.

On December 4, 1996, the Union filed unfair labor practice charges against the Company. The charges alleged that the Company violated the Act in refusing to bargain with the Union.

The parties met on December 10, 1996, to bargain over the effects of the Store's closing. At the meeting, the Union renewed its request for the Agreement. The Company refused to provide it, asserting that the Company had no obligation to do so. In light of the Company's failure to give the affected employees the statutory 60 days notice of the closing, the parties also engaged in a discussion at that time of the Company's responsibilities under WARN. See 29 U.S.C. § 2102. The Company stated that its obligations under the terms of sale pursuant to WARN had passed to the purchaser, Jamieson.

A second bargaining session took place on January 7, 1997. At that meeting, the Union asked for the Agreement in connection with determining the accrued vacation pay owed to the former employees. Although some agreements were reached, the parties did not resolve the dispute over whether certain employees had met the contractual eligibility requirement of one year of "continuous service". The Union asserted that "continuous service" ran from the date of hire to the date of sale, and that the Agreement was necessary to determine whether the disputed individuals had met the requirement. The Company took the position that continuous service ended on the date the Company closed the Store and continued to refuse to provide a copy of the Agreement.

The Board's Order held that the Company had violated Section 8(a)(5) of the Act because the Company had given only two weeks notice of the Store's closing to the affected employees, and because the Company told the Union that all of the Company's obligation under WARN had passed to the buyer, the Union had a right to see the Agreement to evaluate the Company's liability under WARN. The Board's Order required the Company to cease and desist from this unfair labor practice , and

-4-

affirmatively required the Company to furnish the Union with a copy of the Agreement and to post a remedial notice.

On appeal, the Company contends that the Union failed to establish the relevance of its request for the Agreement to assess the Company's liability under WARN and that the Agreement was requested in bad faith.[2]  The Board rejected this argument in its findings and we review those findings by well settled principles as stated in N.L.R.B. v. Wachter Const., Inc., 23 F.3d 1378 (8th Cir. 1994).  As Wachter states:

> [t]he employer has an obligation to supply, upon reasonable request, to the bargaining representative of its employees relevant information to assist the union's effective performance of its duties under a collective bargaining agreement.  Detroit Edison Co. v. NLRB, 440 U.S. 301,303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); NLRB v. Acme Industrial Co., 385 U.S. 432, 435-436, 87 S.Ct. 565, 567-568, 17 L.Ed.2d 495 (1967).  Failure to fulfill that obligation to furnish relevant materials upon request is a violation of the employer's duty to bargain in good faith and may violate § 8(a)(5) of the Act.  Such conduct "conflicts with the statutory policy to facilitate effective collective bargaining." Proctor & Gamble Co. v. NLRB, 603 F.2d 1310, 1315 (8th Cir. 1979).  Information sought that does not directly relate to bargaining unit employees is deemed not to be presumptively relevant.  NLRB v. Postal Service, 888 F.2d 1568, 1570 (11th Cir. 1989); Walter N. Yorder & Sons v. NLRB, 754 F.2d 531, 535 (4th Cir. 1985); Oil Chemical & Atomic Workers v. NLRB, 711 F.2d 348, 359 (D.C. Cir. 1983).  The ordinary standard of what is relevant is a "liberal" one of the type sought in discovery.  Acme, 385 U.S. at 437, 87 S.Ct. at 568.

---

[2]The Board's Order specifically found that the Union had failed to demonstrate a need for the Agreement under either its alter ego theory regarding the relationship between the Company and Jamieson or its theory that the Agreement was necessary to determine the date of the sale as it pertained to the former employees' vacation benefits. These findings are not before the Court except for the impact they would have on the Company's bad faith argument.

Id. at 1384-85.

In Acme, the Supreme Court adopted a liberal "discovery-type" standard to govern the obligation to furnish requested information. Acme, 385 U.S. at 437. Under that standard, the Board's test of relevancy is simply the "probability that the desired information is relevant and that it be of use to the union in carrying out its statutory duties and responsibilities." Proctor & Gamble, 603 F.2d at 1315. Asking for a sales agreement for the specific purpose of determining whether the information contained in such agreement would aid an investigation of a WARN cause of action is relevant and should be discloseable. See Compact Video Service, 319 N.L.R.B. 131, 143 (1995), enforced, 121 F.3d 478 (9th Cir. 1997).

Applying these principles to the facts, the Union has satisfied its burden of showing that the document requested was relevant to its duties and responsibilities to the employee members and their rights under WARN. The Company only gave the employees two weeks notice of its decision to sell the Store. The Union, in response, sought copies of the Agreement setting out the terms of the transfer to the new owner and inquired about the Company's efforts to comply with WARN. It is entirely reasonable to believe that the Agreement was relevant to any efforts made in an attempt to comply with WARN.

Moreover, the Company's assertion that the Union sought the Agreement "in bad faith" is without factual support. The Company argues that the Union's predominant purpose in requesting the Agreement was to assist the Union in its unfair labor charge filed against Jamieson and the Company. The administrative law judge expressly found no bad faith on the part of the Union and that finding was adopted by the Board. The Company has been unable to point to any evidence which contradicts this finding.

Contrary to the Company's assertions, the decision in N.L.R.B. v. Wachter Constr., Inc., 23 F.3d 1378 (8th Cir. 1994), which made a bad faith finding on the part

of a union, is distinguishable.  In <u>Wachter</u>, we found that in spite of a contractual provision giving the employers the right to sub-contract work to non-union firms, the union's  requests for voluminous amounts of information regarding the employer's exercise of the right was not made in "good faith."  <u>Id</u>. at 1386-87.  We found specific evidence that the union's intent was to harass the employers.  <u>Id</u>. at 1387-88.  We further observed that the request for information attempted to coerce  the employers to do business only with union firms.  <u>Id</u>. at 1388.  Here, there is no evidence of such harassment or coercion.  The Company could easily have produced the Agreement if it had so decided.

For the reasons stated, the petition for review is denied and the cross-application of the Board to enforce its order is granted.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.