394 F.3d 233
 WEST PENN POWER COMPANY and The Potomac Edison Company D/B/A Allegheny Power And Allegheny Energy Supply Company, LLC, A Single Employer, And Their Agent Allegheny Energy Service Corporation, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Utility Workers Union of America, Local 102, AFL-CIO, Intervenor.
National Labor Relations Board, Petitioner,
Utility Workers Union of America, Local 102, AFL-CIO, Intervenor,
v.
West Penn Power Company and The Potomac Edison Company D/B/A Allegheny Power And Allegheny Energy Supply Company, Llc, A Single Employer, And Their Agent Allegheny Energy Service Corporation, Respondents.
 No. 03-1984.
 No. 03-2139.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 3, 2004.
 Decided: January 12, 2005.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: John Clark Unkovic, Reed Smith, L.L.P., Pittsburgh, Pennsylvania, for West Penn Power Company, Potomac Edison Power Company, and Allegheny Energy Service Corporation. Joan Elizabeth Hoyte, Office of the General, National Labor Relations Board, Washington, D.C., for the Board. Burton E. Rosenthal, Segal, Roitman & Coleman, Boston, Massachusetts, for Intervenor. ON BRIEF: Arthur J. Chmiel, Allegheny Energy, Fairmont, West Virginia; Darren P. O'Neill, Reed Smith, L.L.P., Pittsburgh, Pennsylvania, for West Penn Power Company, Potomac Edison Power Company, and Allegheny Energy Service Corporation. Arthur F. Rosenfeld, General, John E. Higgins, Jr., Deputy General, John H. Ferguson, Associate General, Aileen A. Armstrong, Deputy Associate General, Robert J. Englehart, Supervisory Attorney, National Labor Relations Board, Washington, D.C., for the Board. Stephanie R. Pratt, Segal, Roitman & Coleman, Boston, Massachusetts, for Intervenor.
 Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.
 Petition for review denied in part and granted in part, and partial remand ordered; cross-application for enforcement granted in part and denied in part. Judge MICHAEL wrote the majority opinion, in which Judge GREGORY joined. Judge NIEMEYER wrote a dissenting opinion.
 OPINION
 MICHAEL, Circuit Judge:
 
 
 1
 This case is before us on the petition of West Penn Power Company and the Potomac Edison Company d/b/a Allegheny Power, Allegheny Energy Supply Company, LLC, and their agent Allegheny Energy Service Corporation (together, Allegheny Power or the Company) to review an order of the National Labor Relations Board (NLRB or the Board). The Board has filed a cross-application for enforcement of its order. The Utility Workers Union of America, System Local 102, AFL-CIO (the Union) has intervened on behalf of the Board. The Board determined that Allegheny Power violated section 8(a)(1) and (5) of the National Labor Relations Act (the NLRA or the Act), 29 U.S.C. § 158(a)(1) and (5), by failing to provide the Union with information about the Company's use of outside contractors for bargaining unit work. We conclude that the Board is correct in its decision to order the Company to produce requested information on incidents of contracting (also referred to as subcontracting), including the use of a contractor for a special meter installation project. Further consideration by the Board is warranted, however, with respect to the Union's request for contractor cost data, and we remand for this limited purpose. We therefore enforce the Board's order except to the extent that it requires the production of cost data.
 
 I.
 A.
 
 2
 Allegheny Power generates electricity and distributes it to customers in parts of several states, including Pennsylvania, Maryland, West Virginia, and Virginia. Since the late 1930s the Company has had collective bargaining agreements with the Union, which represents a unit of approximately 1200 employees. The Union employees work at two dozen service centers, several power stations, and two general shops run by the Company in the four states mentioned above. The Company's use of contractors for regular work has been a subject of bargaining for many years. In a November 1977 Memorandum of Agreement (1977 side agreement) the Company agreed to "amplify" the information provided to the Union in the Company's "Quarterly Contract Work Report." J.A. 280. The 1977 side agreement obligates the Company "to furnish [the Union with] the names of all contractors performing ordinary maintenance and repair work" together with a description of the work and its location. J.A. 280. Though not mentioned in the side agreement, the start and finish dates of the work were included in the disclosures. For many years, or until about mid-1998, the Company provided the Union with contractor work information on a quarterly basis at the level of detail just described.
 
 
 3
 By the mid-1990s Allegheny Power was interested in reducing costs associated with the use of outside contractors for regular maintenance and repair work. The Union, on the other hand, was concerned that the Company's increasing use of contractors would lead to job losses for its membership. The Union's concern was heightened in 1996 when the Company proposed to lay off ninety-six bargaining unit employees at locations in Pennsylvania. When the parties negotiated a new labor agreement in 1996 (effective May 1, 1996, to May 1, 1999), they included two provisions to address these concerns. First, a "Contract Work" provision allowed the Company to continue using outside contractors, but obligated the Company to "maintain[ ] a basic operating and maintenance force of sufficient size to take care of the expected regular work." J.A. 251. Second, a "Resource Sharing" provision permitted the Company to temporarily reassign regular employees to any company location where their services were needed. The Company was required to follow a particular "order of preference" in making reassignments: local employees were used first, employees in contiguous locations were used next, and those in non-contiguous locations were used last. Contractors were employed only if none of the regular employee groups just listed was sufficient to meet the demands of a job. Together, these provisions were intended to maintain stable employment for bargaining unit employees, minimize costs for the Company, and reduce the use of outside contractors. (In October 1997 the parties agreed to extend their May 1996 labor contract through April 30, 2001.)
 
 
 4
 In the mid-1990s the trend toward deregulation prompted Allegheny Power to alter its corporate structure. Previously, Allegheny Power was made up of one parent company with three operating utility companies, each engaged in the generation and distribution of electricity. The restructuring consolidated operations into two business units, one for generation and one for distribution; a separate service corporation performs administrative functions for the operational units. According to the Company, the corporate reorganization led to changes in its hiring and record keeping practices with respect to contractors. Instead of hiring contractors on a "time and material basis," the Company began hiring them on a "project basis," paying a flat sum for each job. J.A. 209. At the same time, the Company began keeping records on contracting at a corporate center rather than at individual service centers or facilities. Finally, in about mid-1998 Allegheny Power changed the format and substance of the contractor reports provided to the Union, making less information available.
 
 B.
 
 5
 The first information request at issue stems from Allegheny Power's switch to the new contractor report format in mid-1998. The new report form had spaces for listing the name of the contractor, the type of work, its location, and the number of workers. In practice, however, the Company noted only a broad description of the type of work, and it usually wrote down "as needed" in the column calling for the number of workers. Moreover, the new form had no space for reporting a project's start and end dates. Union president William J. Sterner believed that the new reports were deplorably inadequate, and he telephoned his complaints to the Company's director of employee relations, Robert N. Kemerer, on three or four occasions in 1999. Sterner pointed out to Kemerer that the reports were incomplete and lacking in detail. Sterner also emphasized to Kemerer that in order to "enforce the contract," the Union "needed to know what was going on out there as far as contracting was concerned." J.A. 134. After Sterner's telephone requests yielded no information, the Union made seven written requests to the Company between September 1999 and January 2001, pointing out that information on contracting was incomplete, inadequate, untimely, or missing altogether.
 
 
 6
 The Union first wrote Allegheny Power about the contractor report problem on September 22, 1999. The letter noted that the second quarter reports were incomplete and that reports were missing for many (seventeen out of twenty-three) of the union-represented service centers. The Union requested complete information, stating that it was necessary "for the Union to protect the interests of [its] members." J.A. 277. When the Company failed to respond, the Union wrote again on November 1, 1999, requesting a complete set of contractor reports for the first three quarters of 1999. Finally, on January 17, 2000, Debra J. West, who had replaced Kemerer as employee relations director, supplied the Union with contractor reports for the third quarter of 1999, showing contract work at a few locations. West asserted that the Company had supplied "the most complete data" it had and that it had satisfied its reporting obligations under the 1977 side agreement. J.A. 279.
 
 
 7
 In a March 7, 2000, letter to the Company, the Union complained again that the contractor reports had routinely been "many months late." J.A. 281. The Union pointed out that the 1977 side agreement did not limit the Union's contractual and statutory rights to request information about contracting. The Union noted that there were no third quarter contractor reports for some seventeen locations, and it asked the Company to clarify whether the failure to supply a contractor report for a particular location meant there was no contract work being done there.
 
 
 8
 The Company continued to provide the Union with contractor information in the same incomplete fashion, submitting certain fourth quarter 1999 data on March 24, 2000, and first quarter 2000 data on May 1, 2000. The Company failed to answer the Union's question about whether the absence of reports for specific locations meant there was no contracting. The Union continued to press for information, reminding the Company in a May 24, 2000, letter that "[i]mportant information about subcontracting has continually been withheld from us." J.A. 338. The Union needed the information on contracting, it said, in order to enforce the 1996 labor contract, including the provisions on Resource Sharing, and "to respond to constant questions from members" about contracting. J.A. 338. Union counsel also weighed in, writing Company counsel on July 6, 2000, to request "data on actual outside contractor usage, at each facility, by dates, job locations, contractor names/addresses and specific types of work." J.A. 44 (emphasis in original). The Union needed the data, its counsel explained, to determine trends in contractor usage and investigate "whether [bargaining unit] jobs or work tasks are being diverted" to other locations. J.A. 43-44.
 
 
 9
 On July 24, 2000, the Company responded to the Union's May 24 letter, stating that the Company had provided "readily available" contractor information. J.A. 285. The Company claimed that it had timely provided "such information as [it was] legally and contractually obligated to supply." J.A. 286. The Company acknowledged, however, that it was "considering the feasibility of refining the form and substance of [the new contractor] reports." J.A. 285. Next, on August 7, 2000, the Company provided the Union with certain second quarter 2000 reports, but reports on more than twenty locations were not included.
 
 
 10
 The "huge gaps" in contractor information for many "locations and months" were highlighted by the Union in a letter to the Company dated August 18, 2000. J.A. 270. The Union complained that the "as needed" language routinely inserted in the "number of [workers]" column in contractor reports was so general as to be meaningless. Because of the Company's inadequate responses, the Union concluded that it would become "harder to piece together [complete information] as time [went] on." Id. As a result, in its letter of August 18, 2000, the Union requested data processing information from January 1, 1994, onward for contractor costs incurred by the Company. The Union explained that this information would reveal trends before and after the effective date of the 1996 collective bargaining agreement, in which the Company committed to reduce the use of outside contractors. The Union sought contractor cost data for each accounting period by location, vendor, and type of work, excluding "localities not serviced by [Union] members and types of work not performed by [them] in the past." Id.
 
 
 11
 The Company continued to send the Union some quarterly contractor reports, but the problems with gaps, abridged information, and tardiness remained. The Union made its final request on January 24, 2001, advising the Company that it had not timely or fully responded to the Union's ongoing requests for contractor information. The letter noted that some of the reports were as much as seven months to two years late. The Union again requested "data-processing [information] showing the trends and amounts paid to outside contractors and the work units performed by them." J.A. 311. The information was necessary, the Union said, for it to investigate whether any particular incidents of contracting violated the labor agreement's Resource Sharing provisions and whether general patterns of contracting violated the Company's commitment to allow unit employees to perform regular maintenance and repair work. According to the Union, the information would also be important for upcoming contract negotiations.
 
 
 12
 The Company's failure to respond to the Union's requests for contractor information, made over a seventeen-month period from 1999 to 2001, may be summed up as follows. First, the contractor report forms did not adequately describe the type of work performed or indicate the start and end dates for contract jobs. Although the form had a column for providing the number of workers used on a particular job, the Company usually inserted "as needed" rather than a number. And the Company did not respond to the Union's objection that this practice was not informative. Finally, at the hearing before the ALJ, the Company's employee relations director conceded that "as needed" could only be relied on as an indication that a contractor had been retained. She admitted (1) that the term could mean the job might not have been started, might be ongoing, or might be completed and (2) that the Company made no effort to ascertain the status of the contract work listed or the number of workers involved. Second, some of the contractor information was provided as much as two years late. Third, for a majority of locations (over twenty) no information was provided at all for many calendar quarters, and the Union was never told whether the failure to provide information for a particular location meant that no contractors were being used. Fourth, no data processing information on contractor costs was provided in response to the Union's requests, and the employee relations director admitted that she made no effort to ascertain what sort of data processing records might be available.
 
 C.
 
 13
 The second information request at issue deals with Allegheny Power's electric load research initiative (ELRI), an experimental project. The ELRI project involved the use of new meters designed to measure customer electric usage and transmit the data on a real-time basis over telephone lines to a data processing center. The Company contracted with Itron, Inc. to install the new meters in a service area in the Union's jurisdiction, and the Union first learned about the project when a Union member happened to see information about it in a Company newsletter to customers. Thereafter, a bargaining unit meter technician complained to the Union that he had seen a non-unit employee, who was not observing proper safety precautions, doing meter installation work in his service area.
 
 
 14
 On November 30, 1999, the Union wrote the Company and asked for a copy of the Itron contract and the meter installation schedule. The Union said it needed the information "to fully represent the interests of its members." J.A. 316. Four months later, on March 22, 2000, the Company furnished the contract and schedule, which indicated that the work had already begun. The Company explained in a subsequent, May 12, 2000, letter to the Union that it contracted out the installation work on the ELRI project due to the existing workload of the Union's meter technicians and the large amount of work to be completed in a short time.
 
 
 15
 In an effort to evaluate the Company's claim, the Union requested additional information in June 2000, including: (1) whether any unit employees were resource-shared out of the meter installation location around the time the work was performed; (2) whether any unit employees were resource-shared out of other locations during the same time period; and (3) the staffing levels on the project compared with those specified in the labor contract during any period in which employees were being resource-shared into the meter installation location. The Company responded by providing resource sharing information concerning only unit meter technicians. It claimed that because meter technicians alone would be qualified to work on the installation project, only data about those workers were relevant to the Union's concern. Additionally, with respect to category (3), the Company replied that there were no labor contract provisions specifying staffing levels in the relevant location. The Union countered on August 18, 2000, that other unit employees such as servicemen and substation electricians could have performed the meter installation work. The Union thus renewed its request for information on any employees who were resource-shared during the project; it also renewed its request for staffing level data, pointing out that a side agreement specified staffing levels for the location in question. The Company, however, failed to provide any of this information.
 
 D.
 
 16
 Dissatisfied with Allegheny Power's responses to these and other requests for information, the Union filed unfair labor practice charges with the Board. Thereafter, the Board's regional director, on behalf of the General Counsel, issued a complaint against the Company alleging that it had violated section 8(a)(1) and (5) of the NLRA by either failing to provide information to the Union or failing to provide it in a timely manner. The complaint dealt with information on six subjects, including the Company's use of outside contractors to perform unit work and the ELRI meter installation project. The case proceeded to a hearing before an administrative law judge who issued a decision finding that the Company violated the Act by failing to produce information on two subjects, outside contracting and the meter installation project. The ALJ ordered the Company to provide any unfurnished information on the meter installation project. With respect to information on contracting, the ALJ ordered the parties "to bargain ... in good faith to reach an accommodation over the level of detail and time period of data to be provided." J.A. 423.
 
 
 17
 The Board affirmed the ALJ's determination that Allegheny had not provided adequate and timely responses to the Union's requests for information on the two subjects mentioned. The Board altered the ALJ's choice of remedy on contractor information, ordering the Company to produce the information instead of bargaining over the extent of production. The Company "should have bargained with the Union over production of information at the time [it was requested]," the Board said. J.A. 411. Moreover, the Board noted that"[a]ny issues regarding the burdensomeness of producing the information are appropriately handled at the compliance stage of the proceeding." Id. Allegheny Energy now petitions for review of the Board's order, and the Board cross-applies for enforcement.
 
 II.
 
 18
 Allegheny Power makes several arguments in urging us to set aside the Board's order requiring the Company to provide the Union with the requested information on contracting and the ELRI meter installation project. With respect to the information on contracting, the Company argues that (1) the Union failed to establish that the information was relevant and necessary, (2) the Company provided the most complete information available to it, and (3) production of the information would have subjected the Company to an undue burden. The Company further argues that even if it violated the Act in failing to produce contractor information, the proper remedy is to require the parties to bargain over the extent of the information to be provided. With respect to the information on the ELRI project, the Company contends that it was not relevant and that the Company made timely and adequate responses in any event. Finally, as an overriding proposition, the Company argues that the Union's demands were made in bad faith, thus excusing the Company for inadequate or late responses. For the reasons that follow, we reject the Company's arguments, except that we remand for further consideration on the limited issue of whether contractor cost data must be provided.
 
 
 19
 An employer's obligation to furnish information needed by the bargaining representative of its employees is rooted in the NLRA. It is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their organizational and bargaining] rights guaranteed" by the Act or "to refuse to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(1), (5). This, among other things, imposes "the general obligation [on] an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). And the duty to provide information "extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement." Id. at 436, 87 S.Ct. 565. A union's right to information depends "upon the probability that the desired information [i]s relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities." Id. at 437, 87 S.Ct. 565. This is a liberal, discovery-type standard, id. and id. n. 6, which means that information is relevant if it "is germane and has any bearing on the subject matter of the case," Walter N. Yoder & Sons, Inc. v. NLRB, 754 F.2d 531, 535 (4th Cir.1985) (internal quotation marks and citation omitted).
 
 
 20
 Some information, such as that concerning bargaining unit employees, is presumptively relevant. Id. When the presumption does not apply — and the Board concedes it does not apply here — "[t]he union need only make a formal request based on a reasonable belief that the information is necessary and show that it is relevant in order to trigger the employer's obligation to give the information." Id. Of course, the relevance of the information, or the basis for requesting it, need not be stated when relevance is "apparent from the face of the request." NLRB v. A.S. Abell Co., 624 F.2d 506, 513 n. 5 (4th Cir.1980). Finally, the Board's determination of relevance "is entitled to considerable deference" on review, and "[t]his is so regardless of whether the ruling is viewed as a finding of fact which is conclusive if supported by substantial evidence or [is viewed] as a mixed question of law and fact in an area of substantial Board expertise." Florida Steel Corp. v. NLRB, 601 F.2d 125, 129 (4th Cir.1979).
 
 III.
 A.
 
 21
 Allegheny Power and the dissent contend that the Union failed to establish the relevance of the requested contractor information or the Union's need for it. The Company divides the contractor information requests into two categories: (1) information about the incidents of contracting[1] and (2) information about the costs of contracting.
 
 1.
 
 22
 We consider first whether the Union established the relevance of, and need for, information concerning the extent of the Company's use of contractors. The Board found that the requested information about contracting was relevant and necessary for the Union to police two provisions in its contract, the Contract Work provision and the Resource Sharing provision. Substantial evidence supports this finding. First, the Contract Work provision allows the Company to contract out maintenance and repair work if it maintains a workforce "of sufficient size to take care of [its] expected regular work." J.A. 251. This provision protects Union members from the diversion of bargaining unit work to contractors. The Union's interest in policing this provision is underscored by the fact that the number of unit employees in Pennsylvania alone shrunk from 1022 to 896 between 1996 and 2000. Second, the Resource Sharing provision permits the Company to reassign employees temporarily to perform necessary work. The Company must assign this temporary work under an order of preference established in the contract: available employees closest to the location needing workers are reassigned first, and contractors are used only as a last resort. Resource Sharing is intended to benefit the Company by reducing costs and to benefit the Union by reducing the use of contractors. The Union can police the Company's compliance with the order of preference provision only if the Company provides it with information about the extent of contractor use. Finally, the Union received occasional word from members that they had seen contractors doing unit work at locations not listed on reports provided by the Company. In sum, the requested information about the extent of contracting is relevant to the Union's duty to administer or police the collective bargaining agreement.
 
 
 23
 The Company and the dissent contend that the Union failed in its burden to inform the Company of why the contractor information was relevant when it was requested. See A.S. Abell Co., 624 F.2d at 513. The Union's burden to state relevancy is excused if the relevance of the information is "apparent from the face of the request." Id. at 513 n. 6. The record establishes that the Union informed the Company on a number of occasions why the contractor information was relevant and needed. To begin with, in 1999, before any written requests were made, the Union president called the Company three or four times to complain that the contractor information was incomplete and inadequate and that the Union needed to know where "contractors were working and what they were doing" in order to "enforce the contract." J.A. 134. When these oral requests yielded nothing, the Union followed up with letters. Most of the letters explained why the information was needed: "to protect the interests of [Union] members" (September 22, 1999), J.A. 277; "to investigate the problems [that is, claims that the Company was violating Resource Sharing and staffing level provisions in the contract] or to respond to constant questions from members" (May 24, 2000), J.A. 338; to ascertain "trends in contractor hours" and to "investigate whether [bargaining unit] jobs or work tasks are being diverted" from certain locations (July 6, 2000), J.A. 43-44; to investigate "trends [in contracting] before and after" the Company made "contract commitments" in 1996 to use Resource Sharing to reduce outside contracting (August 18, 2000), J.A. 270; to investigate whether "patterns of contracting have created across the board unfairness" and whether "any particular subcontracting episodes" violated contractual provisions on Resource Sharing (July 24, 2001), J.A. 311-12.
 
 
 24
 Moreover, as the ALJ found and the Board noted, "the Union's motives in 1999 for obtaining [the contractor] data were crystal clear to the" Company "in view of the parties' long-running discussion on this subject, since at least 1977." J.A. 422; see J.A. 411 n.4. Thus, even if the Union had not fully stated in its written requests the relevance of information about the use of contractors, relevance was apparent from the face of the requests.[2] In sum, to the extent the Union was requesting information on the incidents of contracting, relevance and need were established.
 
 2.
 
 25
 Allegheny Power contends that the Board failed to apply the proper standard for requiring it to provide contractor cost data. In concluding that the Union was entitled to all of the information on contracting it had requested, the Board did not distinguish between information on the incidents of contracting and cost data. The cost data is relevant here because it could show the extent of the Company's use of outside contractors. Nevertheless, to obtain "profit data or other aspects of an employer's financial condition," the "union must show a specific need for the information in each particular case." ACL Corp., 271 N.L.R.B. 1600, 1602 (1984); see also United Furniture Workers of America v. NLRB, 388 F.2d 880, 882 (4th Cir.1967). Of course, when an employer asserts cost as the reason for its "inability to meet the union's demands," that "may provide the [union with] justification for requiring [financial] data." United Furniture Workers of America, 388 F.2d at 882. In any event, the Board did not determine whether the Union had demonstrated a specific need for the cost data in this case.
 
 
 26
 The Company maintains that it "has never claimed that costs played any role in its decision to subcontract." Br. of Petitioner at 38. This position, the Board maintains, is contradicted by the Resource Sharing provision in the labor contract, which states: "The intent of Resource Sharing is to reduce costs and reduce the need for contracting out work." J.A. 255 (emphasis added). The Board also points out in its brief that the Union only requested the cost data toward the end of its efforts, when it became concerned that the Company's foot-dragging was making it increasingly more difficult to piece together information about contractor usage. We decline to settle this argument because the Board should determine in the first instance whether the Union has shown a specific need for the contractor cost data. We will order a limited remand for that purpose.
 
 B.
 
 27
 Allegheny Power argues that it complied with the Act because it provided the Union with the most complete information it had available on the incidents of contracting. The dissent agrees with the Company, noting that once the Company switched to hiring contractors for a flat fee on a "project basis," the "contractors, not [the Company], determined the number and type of laborers used," and the Company "did not collect such data from contractors." Post at 260. This does not excuse the Company. It had the "affirmative obligation to make reasonable efforts to obtain [from its contractors] relevant information," that is, information needed by the Union to police the collective bargaining agreement. Pub. Serv. Co. of Colo., 301 N.L.R.B. 238, 246 (1991); see also Int'l Protective Servs., Inc., 2003 WL 21681313, 173 L.R.R.M. 1023, 1077-78 (2003)("[A]n employer has a duty to supply [to the union] relevant requested information which may not be in its possession, but where the information likely can be obtained from a third party with whom the employer had a business relationship."); Congreso de Uniones Industriales de Puerto Rico v. NLRB, 966 F.2d 36, 37 (1st Cir.1992) ("[A]n employer, confronted with [a union's] information request, [must] make reasonable efforts to obtain the relevant information from another corporation, such as a parent company."). In this case, the Company does not even claim that it asked its contractors for the information, so it did not meet its obligation of making reasonable efforts to obtain it.
 
 
 28
 The dissent cites Korn Indus., Inc. v. NLRB, 389 F.2d 117, 123 (4th Cir.1967), to assert that "Allegheny Power is not obligated to provide the Union with information that it does not have." Post at 260. Korn does not let an employer off the hook that easily; rather, Korn held that the employer is not "required to furnish information which is not available to it." 389 F.2d at 123 (emphasis added). Here, we do not know whether information about the incidents of the Company's use of contractors would have been made available if the Company had simply asked its contractors for it. Again, a reasonable effort by the Company to obtain and turn over the contractor information is key; for without this information, the Union cannot know whether the Company contracted out unit work in violation of the labor contract.
 
 C.
 
 29
 Allegheny Power argues that it was not required to produce the contractor information because production would have subjected the Company to an undue burden. The dissent adds that the Board "failed to give due attention to this defense." Post at 261. The Union's requests for contractor data were unduly burdensome, the dissent claims, (1) because of "the[ir] number, repetitiveness, and overlapping nature," id. at 39, and (2) because compliance would require the Company "to implement new procedures" to gather and disseminate the data, id. As we will explain, the Company failed to establish undue burden at the request and hearing stages. Nevertheless, the Board will allow any issues of undue burden to be revisited and handled at the compliance stage.
 
 
 30
 The Union made seven written requests for contractor information over a seventeen-month period. To the extent these requests were repetitive or overlapping, it was largely the Company's fault. For example, on November 1, 1999, the Union reminded the Company that it had not received contractor reports requested on September 22, 1999; on August 18, 2000, the Union requested centralized data processing information on contractor costs because the information produced so far "ha[d] been so incomplete" and because non-cost data from the field would be "harder to piece together as time goes on," J.A. 270; on January 24, 2001, the Union repeated its request for the contractor "information [it had] been asking for, orally and in writing, over the last two years," J.A. 312; and on January 24, 2001, the Union reminded the Company that it had "never answered [its] questions as to whether a missing report for a location meant there were no contractors," id. (emphasis in original).
 
 
 31
 The Company has not made a case that producing the contractor information would be an undue burden. To do so, the Company would have to show — which it has not done — that it made a reasonable effort to obtain the information from its contractors. In addition, the Company failed to make reasonable efforts to determine what information was available within the Company. Specifically, when the director of employee relations learned for the first time in late 2000 that the Company maintained data processing records on contract jobs, she made no effort whatsoever to investigate and determine what information might be available for production to the Union. Finally, any burden on the Company to produce the information may be of its own doing. As the Union warned in its request of August 18, 2000: "As more months go by, managers will probably say it gets harder and harder to recreate what subcontracting occurred." J.A. 270.
 
 
 32
 The Board considered the Company's defense of undue burden, but determined that the Company was "obligated to produce the information" requested about contracting. J.A. 411. However, in the remedial portion of its order the Board made clear that "[a]ny issues regarding the burdensomeness of producing the information [can be] appropriately handled in the compliance stage of the proceeding." J.A. 411. This arrangement is consistent with the Board's broad discretion to fashion appropriate remedies. See Va. Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); Safeway Stores, Inc. v. NLRB, 691 F.2d 953, 957 (10th Cir.1982).
 
 IV.
 
 33
 Allegheny Power next argues that the Board erred in determining that it violated the Act by delaying the turnover of certain information and by failing to provide other information on the ELRI project on meter installation. The Union requested the Itron contract and Resource Sharing and staffing-level data pertinent to the ELRI project. The Company contends that the Union did not establish the relevance of this information or make its relevance known to the Company. The Board determined that the information requested on this project was relevant to the Union's "major and ongoing concern" with contracting, J.A. 413, and the record supports this determination. Further, as we have already discussed, see supra part III.A, the Company was fully aware that the Union was requesting this type of information for the legitimate purpose of policing the collective bargaining agreement.
 
 
 34
 The Company argues that the Board erred in finding that the Company was tardy in supplying the Union with a copy of the Itron contract and the meter installation schedule. Again, we disagree. The Company entered into its contract with Itron on October 6, 1999, and the Union asked for a copy of the contract and installation schedule on November 30, 1999. The Company did not supply the Union with this information until March 22, 2000, almost four months after it was requested. Work on the project was under way by this time, and the Board found that the Company's delay in providing the contract and installation schedule "prevented the Union from taking any action before the contract work began." J.A. 413. Substantial evidence supports this finding, and the Board did not err in determining that the Company unlawfully delayed in producing the information.
 
 
 35
 Finally, Allegheny Power contends that it provided all of the information needed by the Union with respect to Resource Sharing and staffing levels insofar as these subjects relate to the ELRI meter installation project. The Company, however, limited the information it provided on Resource Sharing to information about meter technicians, even though the Union contended that other unit employees could also do the installation work. In addition, requested staffing-level information was not provided. The Board determined that the Union demonstrated a need for the information: it was necessary for the Union to police contractual provisions on Resource Sharing and staffing levels, provisions that are relevant to the Union's legitimate concern about the Company's use of outside contractors. The record supports this conclusion. In sum, the Union was entitled to the Resource Sharing and staffing-level data that was relevant to the ELRI meter installation project.
 
 V.
 
 36
 Allegheny Power argues that the Union acted in bad faith by flooding it with information requests, thus excusing the Company for inadequate or tardy responses. See NLRB v. Wachter Constr., Inc., 23 F.3d 1378, 1386 n. 8 (8th Cir.1994) (when "the predominate purpose of the party making the request [is] one of bad faith," the other party has no duty to respond). The ALJ, after noting that he would evaluate the case with the issue of bad faith in mind, made no finding of improper motive or bad faith on the Union's part. Nor would the record support such a finding.
 
 
 37
 The dissent contends that the Union's bad faith is evidenced by the fact that it submitted to the Company over a nineteen-month period in 1999 and 2000 "82 separate requests for information concerning 43 different subjects." Post at 252. A review of the list of the requests reveals that they sought information on a broad range of legitimate subjects implicating the Union's duty to represent its members. Specifically, the Union requested information on subjects including pension coverage, safety issues and accidents, employee evaluations, disciplinary issues, underground training, workers' compensation procedures, clothing issues, safety equipment costs, tool repair, and vacation and sick pay. When considered in context, the number of requests over the particular time span (1999-2000) is hardly surprising. The Union represented 1200 members at over thirty locations in four states. Moreover, the requests came during times that were (and are) challenging for both labor and management. As the Company emphasizes, "since the mid-1990s, the electric utility industry has been in a state of flux due to significant government deregulation." Br. of Petitioner at 7.
 
 
 38
 The Company and the dissent point to one of the Union's later requests for expanded information as a specific example of the Union's bad faith. This is the Union's August 18, 2000, request for data processing information on contractor costs from 1994 forward. For no good reason, the Company says, "the Union suddenly changed its demand from seeking information regarding contractors from 1999 and 2000 to seeking detailed cost information from as far back as 1994." Id. at 28 (emphasis in original). Although we are remanding for the Board to give further consideration to whether the cost data should be produced, there is no evidence that the Union sought this information in bad faith. The Union was frustrated because it had not received timely and complete information on contracting after asking for it repeatedly. Because of the passage of time, the Union was legitimately concerned that information would be hard to piece together in the field. This led the Union to conclude that central data processing information showing longer-term trends in contracting might be the only means to evaluate the Company's 1996 commitment to reduce its reliance on outside contractors. The Union's thinking, which it revealed to the Company, reflects no dishonesty of purpose.
 
 
 39
 The Company makes the broad assertion that it responded in good faith to the Union's requests. Picking up on this, the dissent says that "[h]ad the record been taken as a whole, the Board could not have reasonably concluded that Allegheny Power failed to meet its statutory obligation to bargain in good faith." Post at 34 (citing NLRB v. Truitt Mfg. Co., 351 U.S. 149, 154, 76 S.Ct. 753, 100 L.Ed. 1027 (1956) (internal quotation marks omitted)). The dissent appears to suggest that the Company's responses to the contractor information requests do not amount to a violation because the available personnel were "forced to respond simultaneously to other topical requests made by the Union." Id. There is no rule that excuses an employer from complying with requests for relevant information on some subjects simply because it has complied with requests on other, unrelated subjects.
 
 
 40
 In any event, we have reviewed the record as a whole, see 29 U.S.C. § 160(f), and several significant factors are present to defeat the Company's good faith argument. First, the Company did not make any effort, let alone a reasonable one, to obtain the requested information from its contractors. Second, the Company never answered the Union's question of whether the failure to provide reports for seventeen of the two dozen service centers meant there was no contracting in those areas. Third, the Company did not respond to the Union's early objection about the vagueness of the "as needed" language inserted in the "number of [workers]" column on most of the new contractor report forms. Fourth, the employee relations director did not make any investigation into what the Company's data processing records might show with respect to the incidents of contracting. Finally, when the Company did provide information, it was often many months late. Simply put, the Company fell short in meeting its obligations under the NLRA.
 
 VI.
 
 41
 In sum, an objective reading of the record reveals that the Board did not err in concluding that Allegheny Power violated section 8(a)(1) and (5) of the NLRA by its failure to respond adequately to the Union's requests for information about contracting and the ELRI project and by its delay in furnishing information. Therefore, with one limited exception, we deny the Company's petition for review. The petition is granted to allow a remand to the Board for further consideration of the Union's request for contractor cost data. We grant the Board's cross-application for enforcement of its order except as it relates to cost data.
 
 
 42
 
 PETITION FOR REVIEW DENIED IN PART AND GRANTED IN PART, AND PARTIAL REMAND ORDERED; CROSS-APPLICATION FOR ENFORCEMENT GRANTED IN PART AND DENIED IN PART
 
 
 
 43
 Over a 19-month period, Local 102 of the Utility Workers Union of America (the "Union") presented Allegheny Power with 82 separate requests for information regarding 43 distinct issues. During this period, no collective bargaining or arbitration was taking place or was imminent. Nonetheless, Allegheny Power responded to every request — albeit inadequately from the Union's perspective — and devoted hundreds of employee hours to doing so. Dissatisfied with the responses, the Union filed complaints alleging that Allegheny Power violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act by failing to provide information relevant and necessary to the Union's role as the employees' exclusive bargaining representative.
 
 
 44
 The National Labor Relations Board ("NLRB" or "Board") found two violations, holding that Allegheny Power failed to make an adequate response to the requested information on 2 of the 43 issues by not providing all the information requested or failing to provide it timely. Accordingly, the Board concluded that Allegheny Power did not act in good faith in discharging its responsibilities under the National Labor Relations Act. From the NLRB's order, Allegheny Power filed this Petition for Review, and the NLRB filed a Cross-Application for Enforcement of its order.
 
 
 45
 Because the Board (1) failed to consider the record as a whole; (2) failed to require the Union, as a condition to obtaining information, to demonstrate the legal relevancy and need for the information requested; and (3) failed altogether to address Allegheny Power's claimed defenses — burdensomeness, non-existence of documents requested, and Union bad faith — any one of which would have provided Allegheny Power with a complete defense, the Board's order cannot be enforced. Had the Board imposed the legal requirement on the Union of demonstrating the legal relevancy and need for the information or had the Board considered the context of Allegheny Power's conduct, it would have had to conclude, on the basis of binding precedent, that Allegheny Power did not fail in its "statutory obligation to bargain in good faith." NLRB v. Truitt Mfg. Co., 351 U.S. 149, 154, 76 S.Ct. 753, 100 L.Ed. 1027 (1956).
 
 
 46
 For these reasons, I would grant Allegheny Power's Petition for Review and deny the Board's Cross-Application for Enforcement of its order.
 
 I.
 
 47
 The National Labor Relations Act provides that employers engage in unfair labor practices when they "interfere with, restrain, or coerce employees in the exercise of the rights" guaranteed by the Act or when they "refuse to bargain collectively with the representatives of [their] employees." 29 U.S.C. § 158(a)(1), (5). As part of these statutory obligations, employers have a "general obligation ... to provide information that is needed by the bargaining representative for the proper performance of its duties." NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). Thus, a union's right to obtain relevant information "is statutory and not contractual." NLRB v. Am. Nat'l Can Co., 924 F.2d 518, 522 (4th Cir.1991).
 
 
 48
 Because the duty to provide information is inherent in the requirements imposed by the Act, this duty is highly dependent upon context. The Supreme Court has instructed that "[t]he duty to supply information under § 8(a)(5) turns upon `the circumstances of the particular case,' and much the same may be said for the type of disclosure that will satisfy that duty." Detroit Edison Co. v. NLRB, 440 U.S. 301, 314-15, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979) (citation omitted). Indeed, an employer is not automatically obligated to produce available information merely because a union demands it, nor to produce information in a manner the union requests. See id. at 314, 99 S.Ct. 1123. Rather, the relevant inquiry "must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." Truitt Mfg., 351 U.S. at 153-54, 76 S.Ct. 753; see also Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB, 598 F.2d 267, 270-71 (D.C.Cir.1979) (clarifying that the good-faith requirement applies both to employer and union). We therefore examine the nature of the union's requests for information, the statutory context in which the requests were made, and the nature of the employer's response when determining whether an NLRB ruling is appropriate in "the circumstances of the particular case."
 
 
 49
 Accordingly, to obtain information under § 8(a)(5), a union must demonstrate, as a condition to obtaining the information, that the information is relevant and necessary to its performance of collective bargaining responsibilities. See NLRB v. A.S. Abell Co., 624 F.2d 506, 510 (4th Cir.1980). While information pertaining to union employees is presumptively relevant, other information is not entitled to such a presumption. Id. Thus, when a union demands information other than information pertaining to union employees, the union bears the burden of establishing its relevancy. See Walter N. Yoder & Sons, Inc. v. NLRB, 754 F.2d 531, 535 (4th Cir.1985); A.S. Abell, 624 F.2d at 510. To demonstrate relevancy, a union must
 
 
 50
 make a formal request based on a reasonable belief that the information is necessary and show that it is relevant in order to trigger the employer's obligation to give the information....
 
 
 51
 * * *
 
 
 52
 ... [I]nformation is relevant if it is germane and has any bearing on the subject matter of the case.
 
 
 53
 The practical burden upon the union then is to show that the information will aid investigation of contract violations where the union has established a reasonable basis to suspect such violations have occurred. Actual violations need not be established in order to show relevancy.
 
 
 54
 Walter N. Yoder & Sons, 754 F.2d at 535 (internal quotation marks and citations omitted). A union must also provide facts that support its assertion of relevancy and need. See Rice Growers Ass'n of Cal., Inc., 312 N.L.R.B. 837, 838 (1993). "Reasons not brought to the attention of the Company at the time but later used to justify positions in administrative hearings should not be used to convict the Company of an unfair labor practice when these reasons were not brought to its attention contemporaneously, they being not apparent from the face of the request." A.S. Abell, 624 F.2d at 513 n. 5.
 
 
 55
 When a union has carried its burden of demonstrating relevancy and necessity, the burden of production shifts to the employer. Even so, the employer need not produce information that it does not have, nor need it conduct studies for the purpose of supplying the union with the information requested. See Howe K. Sipes Co., 319 N.L.R.B. 30, 38 (1995) ("[A]n employer can be expected to supply only that information which it actually possesses or it can reasonably acquire. There is no requirement that, in response to a request for information, an employer conduct independent cost studies or analysis"); see also Korn Indus., Inc. v. NLRB, 389 F.2d 117, 123 (4th Cir.1967). The employer also need not honor the union's request when the employer can demonstrate that the union's request was made in bad faith. See NLRB v. Wachter Constr., Inc., 23 F.3d 1378, 1385 (8th Cir.1994). Finally, an employer cannot be compelled to provide information if doing so would cause undue burden. See Westinghouse Elec. Corp., 129 N.L.R.B. 850, 864 (1960) ("[T]he obligation of an employer to bargain in good faith does not require him to comply with a Union's request for information if compliance is `unduly burdensome'"); see also Wachter Constr., 23 F.3d at 1388; Safeway Stores, Inc. v. NLRB, 691 F.2d 953, 956 (10th Cir.1982).
 
 
 56
 With these principles in hand, we review the NLRB rulings for compliance with them. And with respect to findings, we determine whether they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f).
 
 II.
 
 57
 The employer in this case, West Penn Power Co. and The Potomac Edison Co. d/b/a Allegheny Power and Allegheny Energy Supply Co. ("Allegheny Power"), engages in the generation and distribution of electricity and operates power stations in Maryland, Pennsylvania, Virginia, and West Virginia. Allegheny Power maintains collective bargaining agreements with four different unions, including the union in this case, the Utility Workers Union of America (the "Union"), with the earliest agreement reached in the late 1930s. The relevant collective bargaining agreement between Allegheny Power and the Union became effective May 1, 1996, to expire April 30, 1999. But by an agreement reached in October 1997, the collective bargaining agreement was extended through April 30, 2001.
 
 
 58
 Over the years, Allegheny Power had long provided relevant information requested by the Union so that the Union could perform its duties as the collective bargaining representative. In addition, in 1977, Allegheny Power entered into an agreement ("1977 Agreement") to provide the Union with copies of "Quarterly Contractor Work Reports" regarding non-union contractors under hire by the Company. Under this arrangement, Allegheny Power provided the names of contractors that performed ordinary maintenance and repair work for the Company, the specific work performed, and the location of such work. The 1977 Agreement also permitted the Union to submit specific requests for contractor data and required the Company, in response, to "furnish similar information and disclosure within its possession on contractors or subcontractors whenever the Union believe[d], in good faith, it ha[d] a specific dispute or grievance on a specific use of contractors." This agreement, however, contained no requirements regarding the exact format of the contractor reports, and no such requirements were ever added by the parties.
 
 
 59
 During the mid-1990s, government deregulation and increasing utility competition created significant challenges for, and required commensurate adjustments by, the electric utility industry. In response to the challenges, Allegheny Power changed from an "operating-company" model to a "business-unit" model, which involved the consolidation of three previously separate operating companies into a single entity. Among the changes that resulted from this consolidation was a shift from hiring non-union contractors "on a time and material basis" to hiring them on a "project basis." After that change, Allegheny Power provided job specifications to the contractors for each project, and the contractors, in turn, charged a flat rate, allocating such workers and resources as they deemed necessary to complete the project.
 
 
 60
 In the years before 1999, Allegheny Power received "very few requests" for information from Local 102, the Pennsylvania chapter of the Union. But all of that changed in May 1999.
 
 
 61
 Beginning with a request on May 3, 1999 and continuing for some 19 months thereafter, the volume of information requests submitted by Local 102 increased dramatically and expanded well beyond the traditional information requests relating to arbitration or contract negotiations. Indeed, there was no arbitration or contract negotiation ongoing or anticipated in 1999; the 1999 expiration date of the collective bargaining agreement had been extended to 2001 through an October 1997 agreement. Yet the record shows that Local 102 submitted, over the next 19 months, 82 separate requests for information concerning 43 different subjects, ranging over a wide gamut from matters regarding individual Union members, to clothing concerns, underground training, and tool repair. Moreover, these requests were made in addition to ongoing meetings between Company officials and their Union counterparts "to talk about general company issues" and "to talk and resolve issues such as fire resistant clothing, resource sharing ... [and] grievances." These requests were also in addition to regular telephone conversations between the Company and Local 102. Despite the open avenues for oral communication, however, the number of the Union's formal information requests continued to swell.
 
 
 62
 Faced with this significant increase in information requests, Allegheny Power's response required — as the ALJ found in this case — the effort of "five fulltime employees [devoting] hundred[s] of hours." The president of Local 102 later agreed that the Union had "asked for voluminous information, and ... got voluminous information, although not always everything [it] wanted." And the ALJ found that Allegheny Power responded "in some fashion" to all of the requests. A summary of the requests and responses, as contained in the record at J.A. 343-51, follows: NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 63
 Apparently dissatisfied with Allegheny Power's responses, the Union filed complaints with the NLRB, alleging that Allegheny Power failed to provide timely and sufficient information on 6 of the 43 topics requested by Local 102, namely requests with respect to (1) Quarterly Contractor Work Reports, (2) the Electric Load Research Initiative project, (3) foreign electric utilities, (4) meter-related data at the Oakland and Cumberland service centers, (5) Local 102 member Phil Cosner, and (6) 10-hour vacations. On numbers (1) and (2), the NLRB found violations.
 
 
 64
 With respect to number (1), the Quarterly Contractor Work Reports, Local 102 complained that changes to the format of Allegheny Power's reports reduced the flow of information to the Union and thus constituted an unfair labor practice. Prior to 1998, each service center and power station in the Allegheny Power network compiled numerical totals of the non-union workers contracted to perform specified tasks and then provided these data to the Union. In 1998, following Allegheny Power's reorganization, the Company centralized its data collection efforts and began to hire outside contractors on a "project basis." As a result of these changes, the information provided to Local 102 in the Quarterly Contractor Work Reports became more "general" than had previously been the case. Instead of providing numerical data and descriptions of the employees staffing a project, Allegheny Power listed the number to be "as needed" by the contractor because the contractor, not Allegheny, determined the number and kinds of workers to staff the project, billing Allegheny Power only on a project basis, not on a time-and-materials basis. This generalization in reporting, the Union contended, constituted an unfair labor practice.
 
 
 65
 With respect to number (2), the Electric Load Research Initiative project (the "ELRI" project), Local 102 complained that Allegheny Power provided inadequate information on an untimely basis. In October 1999, Allegheny Power entered into a contract with Itron, Inc., to install hardware and provide data collection services for the ELRI project, a pilot program designed to ascertain whether data from customers' meters could be transmitted to the utility by telephone, in real time, without the use of meter readers. After a Union worker noticed ELRI-related activity in 1999 at a Frederick, Maryland facility, the Union contacted Allegheny Power in November 1999 and requested a copy of the Company's contract with Itron, along with a time schedule for installation of the ELRI meters. Allegheny Power provided this information in March 2000. The Union then made two further requests in April 2000 for a significant amount of additional information on numerous topics. For example, the Union sought "whatever documents describe or refer to the Company's ELRI work and the activities of Itron, including but not limited to advisories and newsletters"; descriptions of training and safety procedures relating to the ELRI project; use of identification by Itron's workers; and detailed information on "each individual who has been involved with the project." Despite the magnitude of this request, Allegheny Power responded within one month with a lengthy, point-by-point response. This response was, in turn, met by another broad inquiry the following month, and, after first informing the Union that the breadth of the inquiry was causing delay in the Company's response, Allegheny Power then provided another lengthy reply. Later, apparently on its own initiative, Allegheny Power provided Local 102 with copies of its ELRI project newsletter along with an accounting of subcontractor hours devoted to the project, broken down by location. Nevertheless, in its complaint to the NLRB, the Union contended that Allegheny Power's responses were untimely and inadequate and thus constituted an unfair labor practice.
 
 
 66
 In finding that Allegheny Power committed unfair labor practices in failing to provide adequate information on a timely basis, the Board found that the parties' 1977 Agreement on the Quarterly Contractor Work Reports did not limit the Union's right to make information requests pursuant to § 8(a)(5). It concluded that the Union sought such information "to police its collective-bargaining agreement" and that "the timing of the requests, as related to the upcoming [contract] negotiations, strongly supports the Union's need for the information." Similarly, the Board found that Allegheny Power violated § 8(a)(5) by failing adequately to provide the union with "staffing-level data" from the ELRI project. The Board also found that a four-month delay by Allegheny Power in responding to one of the Union's four written requests on the ELRI project also violated § 8(a)(5), as did the Company's failure to provide resource-sharing information beyond meter technicians. As a remedy for these purported violations, the NLRB entered an order, dated July 11, 2003, requiring Allegheny Power to provide the data sought by the Union.
 
 
 67
 From the Board's order, Allegheny Power filed this Petition for Review, and the Board filed a Cross-Application for Enforcement of its order.
 
 III.
 
 68
 In addressing the two issues on which the NLRB found violations, the Board measured only a handful of Allegheny Power's responses in isolation, without considering the 19-month context in which the Company had responded to the Union's numerous information requests. In doing so, the Board failed to address the issues on the "record considered as a whole," as required by statute. 29 U.S.C. § 160(f). For the same reason, it also failed to take into account, again as required by law, "the circumstances of the particular case." See Truitt Mfg., 351 U.S. at 153, 76 S.Ct. 753 (emphasis added). When the record as a whole is considered, the evidence does not support a finding that Allegheny Power failed in its "statutory obligation to bargain in good faith." Id. at 154, 76 S.Ct. 753.
 
 
 69
 The Union submitted 82 requests for information, and the ALJ found as facts that no request by the Union went unanswered and that Allegheny Power committed the resources of five full-time employees to provide responses to these requests. Even on the two issues as to which the Board found violations, the Union had made multiple and various requests, and Allegheny Power was required to make numerous responses, providing the Union with a large volume of material. Taken in this context, Allegheny Power's responses do not justify the Board's finding that the Company failed to bargain in good faith.
 
 
 70
 The Union chose to litigate the responses on 6 subjects, but these 6 inquiries represented only a small portion of the 43 subjects on which the Union demanded information. Also, there were repeated and various inquiries on many subjects, so that the 43 different topics became the subject of 82 separate inquiries presented over the space of 19 months. In addition, the Board failed to consider that the volume of information that the Union requested was far greater than the number of requests that had theretofore been made by Local 102, or, for that matter, by any other union. It also failed to take accurate notice of the extent to which the requests were proximate to other relevant events, such as arbitration cases or contract negotiations. The failure to take these contextual elements into account fatally undermined the NLRB's findings.
 
 In his findings of fact, the ALJ found:
 
 71
 From May 1999 to December 2000, the Union requested information from [Allegheny Power] regarding 43 subject areas, which was a substantial increase over previous years. The Company responded in some fashion to all 43 requests, taking five fulltime employees hundred[s] of hours to do so.
 
 
 72
 Moreover, the ALJ acknowledged that in the midst of this deluge, the staffperson employed by Allegheny Power to manage such requests was replaced. Finally, the ALJ noted that "[t]he most recent collective-bargaining agreement ran from May 1, 1996 to May 1, 1999, but the parties extended it until April 30, 2001," a fact apparently overlooked by the Board.
 
 
 73
 To appreciate these statistical data in the record, the Board would have had to have recognized that beginning on May 3, 1999, and continuing through December 7, 2000, the Union issued on average one request every seven days, and that additional requests were submitted even before responses had been received from Allegheny Power on earlier requests. Yet Allegheny Power responded to every request. Of the 82 submitted, it responded to 32 (or 40%) within a 30-day period; 54 (or 67%) within 60 days; and 65 (or 80%) within 90 days. Moreover, the 43 various topics of inquiry were not submitted chronologically or in discrete time periods. To the contrary, the Union submitted information requests in a haphazard fashion. For example, on September 22, 1999, the Union submitted its first request regarding the Quarterly Contractor Work Reports. While Allegheny Power was preparing its response to that request, the Union submitted nine additional requests for information concerning seven other topics. Nonetheless, the Company responded to all of these other inquiries, taking an average of 24 days per inquiry to submit its responses. This example demonstrates how a narrow view of the record — examining only the response to the one request on Quarterly Contractor Work Reports — produces a distortion of the facts. Yet this was the approach followed by the Board.
 
 
 74
 In addition, the Union's information requests were complex in nature and required aggregations of many different types of data. The record before us on appeal contains only a limited snapshot of the total information requests, but even this small portion of the picture is dramatic. For example, the Union wrote on April 13, 2000, to request information about the ELRI project, and it asked for nine different categories of information, ranging from details about Allegheny Power's contract with Itron, to information on each person involved in the ELRI project, to descriptions of the skills related to the ELRI project, to training programs implemented by Allegheny Power to develop such skills. To answer these inquiries required Allegheny Power to devote significant amounts of time and human resources, particularly considering that the limited number of the Company's personnel was also forced to respond simultaneously to other topical requests made by the Union.
 
 
 75
 The inclusion of these contextual elements, which the Board failed to consider, provides a totally different picture from that presented by the Board and by the majority. Had the record been taken as a whole, the Board could not have reasonably concluded that Allegheny Power failed to meet its "statutory obligation to bargain in good faith." See Truitt Mfg., 351 U.S. at 154, 76 S.Ct. 753.
 
 IV.
 
 76
 In considering out of context the two topics on which the Board found violations — the Quarterly Contractor Work Reports and the ELRI project — the Board also failed to enforce upon the Union its established legal duty to demonstrate factually, as a condition to receiving information, that the information is relevant and necessary. The Board accepted implicitly the Union's highly generalized statement, made without any factual support, that the information was needed "in order for the union to protect the interests of [its] members." In challenging the adequacy of this explanation as a justification for the information, Allegheny Power contends that, because the information did not relate to Union members, the Union was required to demonstrate the relevance of the information and the Union's need for it, particularly when no arbitration or collective bargaining negotiations were ongoing or pending. Allegheny Power's position is indisputably supported by applicable law.
 
 
 77
 When information requested does not pertain to union employees — as is the case for the two issues before us — it is not presumptively relevant. See Wachter Constr., 23 F.3d at 1384; A.S. Abell Co., 624 F.2d at 512; United Furniture Workers v. NLRB, 388 F.2d 880, 882 (4th Cir.1967) (finding that cost, profit, and other financial information are not presumptively relevant). In order to obtain information that is not presumptively relevant, the Union must
 
 
 78
 make a formal request based on a reasonable belief that the information is necessary and show that it is relevant in order to trigger the employer's obligation to give the information....
 
 
 79
 * * *
 
 
 80
 The practical burden upon the union then is to show that the information will aid investigation of contract violations where the union has established a reasonable basis to suspect such violations have occurred.
 
 
 81
 Walter N. Yoder & Sons, 754 F.2d at 535 (emphasis added) (internal quotation marks and citations omitted).
 
 
 82
 In addition, for financial data, the Union had to show a "specific need in each particular case" or had to establish that the Company, by way of justification for subcontracting work, claimed a present financial inability to meet the Union's demands. United Furniture Workers, 388 F.2d at 882; see also Equitable Gas Co. v. NLRB, 637 F.2d 980, 993 (3d Cir.1981) ("[D]ata regarding subcontracting costs where bargaining is not required, is relevant only when lower costs are urged by the employer as a motivating factor behind the subcontracting decision").
 
 
 83
 Finally, regardless of the subject matter of a request, the Union in every case is obligated to establish its claim to the information, see Rice Growers Ass'n, 312 N.L.R.B. at 838, and the justification must be presented to the employer "contemporaneously," not merely as a later rationalization made during administrative hearings, A.S. Abell Co., 624 F.2d at 513 n. 5.
 
 
 84
 The Union's justifications for the information in this case met none of the criteria established by law. Rather, the Union simply relied on the conclusory, boilerplate-type statement that the Union needed the information "to protect the interests of its members." The requests allege no contract violations, negotiations, or arbitrations, and they contain no facts supporting the Union's claim that the information was necessary "to protect the interests" of Union members. Subsequent requests repeated and expanded the Union's demands but continued to lack explanations. Such "boilerplate" justifications do not meet the requirements of law. Wachter Constr., 23 F.3d at 1385 (internal quotation marks omitted). Moreover, approving the use of "boilerplate" rationales would "wreak havoc on a negotiating process." Id. at 1386. Further, with respect to the Union's demands for financial data, the Union never contended that Allegheny Power asserted that lower costs had been a motivating factor in its subcontracting decisions.
 
 
 85
 In its findings, the ALJ acknowledged that the Union "used no magic words to state specifically why it wanted more and better subcontracting information." But the ALJ stated that he "believe[d] that the Union's motives in 1999 for obtaining this data were crystal clear," and he wrote that "data on subcontracting will no doubt be useful to the Union in negotiating the successor agreement in 2001."
 
 
 86
 Although it is true that the law does not require a union to provide "magic words," it does require a union to provide a reason for its request and, if necessary, to support its reason with facts. See A.S. Abell Co., 624 F.2d at 512, 513 n. 5; Rice Growers Ass'n, 312 N.L.R.B. at 838. By stating that the reason that the Union required the data was "crystal clear," the ALJ evidently felt that the rationale was apparent from the face of the requests. See A.S. Abell Co., 624 F.2d at 513 n. 5 (suggesting that a rationale can be accepted if it is "apparent from the face of the request"). This, however, is not supported by the record. The first two requests made by the Union (September 22, 1999, and November 1, 1999) are so threadbare that Allegheny Power would have been forced to guess at their rationale. Indeed, quite logically, the Company regarded the information requested in 1999 to be governed by the 1977 Agreement, and that agreement required the Union to tie its demands to "a specific dispute or grievance on a specific use of contractors." Recognizing that these contractual obligations were not met, the Board relied only on the statutory duty, which allows other justifications of relevancy. Because the record supported no other justifications, the Board relied on two post-hoc rationalizations, which were not even made by the Union until 21 months after its initial inquiry.
 
 
 87
 According to the Board, the Union's requests were justified because the information requested enabled the Union "to police its contract," since its collective bargaining agreement permitted Allegheny Power to subcontract work "only to the extent that the [Company] maintained a workforce sufficient to perform the regular expected work of the [Company]." The Board also asserted that the data enabled the Union to enforce a "Resource Sharing" provision in the collective bargaining agreement that allowed Allegheny Power to send Union employees to different job sites within the Company's network. As plausible as these two rationales might be, they were stated by the Union after the fact, and then only to win their case. We have clearly stated that a supporting rationale must be articulated "contemporaneously" with the information request and must not be provided later to bolster a case for administrative review. See A.S. Abell Co., 624 F.2d at 513 n. 5. Certainly the Board cannot rely on post-hoc rationalizations to determine that the Company acted in bad faith, when it was given no legally sufficient reason at the time the requests were made.
 
 
 88
 In addition, the Board noted that the "parties were beginning to prepare for collective-bargaining negotiations for a new contract" and that "the timing of the [Union's] requests, as related to the upcoming negotiations, strongly supports the Union's need for the information." This conclusion, however, is based on a misconception of the record. While the collective bargaining agreement between Allegheny Power and the Union did run from May 1, 1996, to May 1, 1999, the Board failed to recognize that in October 1997 the parties had extended the contract to April 30, 2001. Just as importantly, the Union itself did not rely on "upcoming negotiations" to justify its requests until January 2001, at which point it was looking to the looming April 30, 2001 expiration date. The record simply does not support the NLRB's rationalization that the Union's information requests, which began in 1999, "related to ... upcoming negotiations."
 
 
 89
 In the absence of an impending arbitration, collective bargaining, or some other suspected contract violation, the Board erred in finding violations of §§ 8(a)(1) and 8(a)(5). The Board simply failed to recognize that the Union, along with the Company, was obliged to fulfill certain legal duties in its information requests.
 
 V.
 
 90
 Finally, the Board failed to address three affirmative defenses advanced by Allegheny Power, any of which could have precluded the finding of a violation by the Board. Allegheny Power contended (1) that it was not obligated to generate information — i.e., information that it did not have — nor was its failure to provide information in the format requested by the Union a basis for finding a violation; (2) that the information requests were unduly burdensome; and (3) that the Union's conduct in making so many burdensome and irrelevant requests over a short period of time, in the particular factual context, evidenced bad faith on the part of the Union. I address these in turn.
 
 A.
 
 91
 One of the Union's most persistent assertions relates to Allegheny Power's failure to provide specificity with respect to Quarterly Contractor Work Reports. In finding a violation on this claim, the Board failed to respond adequately to the Company's defense that after 1998, when Allegheny Power changed its method of doing business in engaging contractors, it did not itself have the information requested. Before 1998, Allegheny Power was able to give the specific number of persons working on each project because it paid contractors on a time-and-material basis. But in 1998, Allegheny Power altered its method of doing business by electing to hire contractors for a flat fee on a "project basis," as part of a general restructuring effort in the wake of utility deregulation. Under the "project" approach, contractors, not Allegheny Power, determined the number and type of laborers used to accomplish a given project, and the number of workers was not part of the contractors' billings. Consequently, Allegheny Power did not collect such data from contractors in the course of its business. Moreover, no one has suggested that Allegheny Power retained, in the regular course of business, the number and type of laborers used to accomplish the tasks subcontracted out on a flat-fee basis to independent contractors, when the contractors themselves made the determination.
 
 
 92
 It is well-established that Allegheny Power is not obligated to provide the Union with information that it does not have, nor to provide information in the format desired by the Union. See Korn Indus., Inc. v. NLRB, 389 F.2d 117, 123 (4th Cir.1967) (holding that an employer need not produce information that is not available to it for the purpose of supplying the union with information requested); Food Employer Council, Inc., 197 N.L.R.B. 651, 651 (1972) (holding that an employer need not furnish information in the exact form in which the union requested it). The finding that Allegheny Power violated the Act by failing to supply this information is thus erroneous by reason of the established principles of Korn Industries and Food Employer Council.
 
 B.
 
 93
 The Board also failed to take into account the burdensomeness of the Union's demand, particularly in light of the number, repetitiveness, and overlapping nature of the requests, as well as the Company's explanations for the absence of more elaborate responses. Under the NLRB's ruling, Allegheny Power would be forced to implement new procedures and direct new or existing resources to gather, compile, and disseminate contractor data that otherwise would be of no value to the Company. After 1998, such data simply were no longer relevant to Allegheny Power because of its shift to project-based contracting. Forcing the Company to create a process whose sole purpose would be to gather data to satisfy the Union's demands would work an undue burden on the Company. The NLRB failed to give due attention to this defense, considering that the Company is not obligated to produce information that it does not have and would have to generate with additional resources. Cf. Wachter Constr., 23 F.3d at 1388; Safeway Stores, Inc. v. NLRB, 691 F.2d 953, 956 (10th Cir.1982).
 
 C.
 
 94
 Finally, Allegheny Power has alleged that the Union's requests were made for ulterior motives and in bad faith. The Board never addressed this issue, which would provide Allegheny Power with a complete defense. See Wachter Constr., 23 F.3d at 1380 (holding that a company did not have to honor an information request because "the union's predominant purpose in making its request was to harass the employers and force them to cease a practice permitted under the collective bargaining agreement").
 
 
 95
 In this case, Allegheny Power contends that the flood of information requests submitted by the Union began shortly after Allegheny Power indicated that it would not pay Union officers for attendance at certain meetings. After Allegheny Power made its position known to the Union, the Union made six requests within a six-week period, and the requests continued thereafter. The Company contended that the "Union's campaign of flooding Allegheny Power with information requests, shortly after this dispute, with no contract negotiations scheduled or pending, and in a dramatic departure from its past behavior, ... demonstrates the bad faith motive for these requests."
 
 
 96
 In further support of its claim, the Company contended that on two occasions when Allegheny Power asserted that it had provided all the information requested, "the Union suddenly changed its demand from seeking information regarding contractors from 1999 and 2000 to seeking detailed cost information from as far back as 1994" and, with respect to the 10-hour vacation issue, changing its demand to seek all information since 1996.
 
 VI.
 
 97
 At bottom, it is apparent that the National Labor Relations Board so narrowed its focus in this case that it (1) failed to view the record as a whole and to consider Allegheny Power's conduct in that context; (2) failed to apply to the Union its legal duty to satisfy certain conditions before receiving information; and (3) failed to address the three affirmative defenses raised by Allegheny Power. Had the Board followed the law and addressed all of the issues before it, it could not have found on this record that Allegheny Power violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5).
 
 
 98
 Accordingly, I would grant Allegheny Power's Petition for Review and deny the Board its Cross-Application for Enforcement.
 
 
 
 Notes:
 
 
 [1]
 For purposes of this opinion, we define "information about the incidents of contracting" to include non-financial information such as contractor name and location, description and dates of work, and number of workers involved
 
 
 [2]
 The Board determined that the contractor information was relevant for the additional reason that the Union was "beginning to prepare for collective-bargaining negotiations for a new contract." J.A. 411. The Company argues that this, too, is error. We will not deal with this argument because the Union's request was sufficiently justified by the need to monitor the Company's compliance with contractual commitments